Estate of A. E. Larson, Deceased, Shirley D. Parker, Administrator, d.b.n.c.t.a. v. Commissioner. Rose B. Larson v. Commissioner.
Estate of Larson v. Commissioner
Docket Nos. 104214, 104834, 104835.
United States Tax Court
1944 Tax Ct. Memo LEXIS 249; 3 T.C.M. (CCH) 481; T.C.M. (RIA) 44168; May 17, 1944
*249 H. B. Jones, Esq., Colman Bldg., Seattle, Wash., and A. R. Kehoe, Esq., for the petitioners. Arthur L. Murray, Esq., for the respondent. DISNEY
Memorandum Findings of Fact and Opinion DISNEY, Judge: The present proceedings involve the redetermination of the following deficiencies in income taxes: Docket
Year
Taxpayer
No.
Amount
1934
Estate of A. E. Larson
104214
$148,403.81
1936
Estate of A. E. Larson
104834
9,065.50
1935
Rose B. Larson
104835
92,045.86
1936
Rose B. Larson
104835
57,816.84
These cases were consolidated for hearing and a stipulation was filed in each of them. The stipulation filed in Docket No. 104834 determines the final liability of the petitioner therein for the taxable year, 1935. The stipulations filed in Docket Nos. 104834 and 104835 provide that the issue as to the fair market value of certain shares of stock as of June 7, 1934, is to be governed by the final determination of that same issue in Docket No. 104214. Effect will be given to the stipulations filed in all of these cases in the decision to be entered in each case under Rule 50. In Docket No. 104214, petitioner asserted a right to recoupment on account of overpayment of *250 estate taxes, but, on brief, abandoned this position. One issue is common to all these cases, namely, the fair market value of the common stock of Sunshine Mining Co. as of June 7, 1934. In addition to the question of the fair market value of this stock, Docket No. 104214 also involves the statute of limitations, and with respect to change of value, the question of estoppel. The stipulations filed in these cases are incorporated herein by reference as part of our findings of fact. So far as pertinent, they are here set forth together with other facts from evidence adduced, as follows: Findings of Fact A. E. Larson (hereinafter sometimes called decedent), a resident of Yakima, Washington, died testate on June 7, 1934. Prior to his death, he had been president of the Sunshine Mining Co., a corporation, as well as vice president, director, and a member of the executive committee of the Yakima First National Bank. His will was filed in the Superior Court of the State of Washington in and for Yakima County (in Probate) and duly admitted to probate on June 13, 1934, and simultaneously therewith the Yakima First National Bank (hereinafter sometimes called executor), a corporation, was *251 appointed executor of said estate. A. E. Larson was survived by his spouse, Rose B. Larson, who is the sole resduary legatee and devisee under decedent's will. This will provided for specific bequests in the amount of $482,000. Paragraph seventeen of the will provided as follows: "The executor of my estate shall have three years if necessary to liquidate enough property to pay all of the above bequests." Debts outstanding at the time of decedent's death amounted to $152,463.17. The current expenses of administration which the executor was under a duty to pay included $1,500 monthly to Rose B. Larson and $1,000 monthly to Shirley Parker, Mrs. Larson's son by a former marriage, for services relating to the administration of the estate. In addition to certain income from real estate, the estate received, on July 2, 1934, dividend No. 30 on 210,974 shares of common stock of the Sunshine Mining Co. at the rate of 16 cents per share, or a total of $33,755.84; on October 1, 1934, the estate received dividend No. 31 on 180,474 shares of this stock at the same rate, or a total of $28,875.84; and in December 1934, the estate received a dividend of 20 cents per share on 125,974 shares, or *252 a total of $25,194.80. All of the property, real and personal, which constituted the estate of A. E. Larson (hereinafter sometimes called the estate), was the community property of the decedent and his wife under the laws of the State of Washington. Part of the estate consisted of 210,974 shares of common stock of Sunshine Mining Co.The Sunshine Mining Co. had an authorized capital stock of 1,500,000 shares of common stock with a par value of 10 cents per share. At the time of decedent's death, 1,488,822 shares had been issued and were outstanding. Sunshine Mining Co. stock in the amount of 15,000 shares, which belong to the estate, [1] was sold for $87,375, or 5.82 1/2 per share, and payment was received on August 2, 1934; and 70,000 additional shares were sold between September 1934 and December 5, 1934, at $6.90 per share. The following table shows the date upon which payment was received by the estate as a result of these sales and the prices of this stock on those dates on the New York Curb Exchange: No. Shares N. Y. Curb Exchange
Date
Sold
High
Low
Close
Sept. 1
3,000
8 5/8
8 1/2
8 1/2
7
1,500
8 7/8
8 1/2
8 3/4
13
10,000
8 7/8
8 3/4
8 7/8
15
1,000
No. Sales.
26
5,000
8 5/8
8 3/8
8 5/8
Oct. 11
5,000
10 1/8
9 1/2
9 7/8
Nov. 7
22,000
10 1/4
10 1/8
10 1/8
16
1,500
12 1/8
11 5/8
11 3/4
23
5,000
12    11 3/4
11 3/4
24
5,000
12 1/8
11 3/4
12    30
5,000
12 5/8
12 1/4
12 1/2
Dec. 5
6,000
12    11 1/8
11 1/8
*253 The sale of the 15,000 shares of stock at $5,82 1/2 per share was authorized by two orders of the Superior Court in and for the County of Yakima, State of Washington, one dated July 26, 1934, and the other dated July 31, 1934. These orders were made pursuant to two petitions filed by the executor. In the first of these petitions, the executor represented that it had received an offer from Grande, Stolle & Co., a corporation (hereinafter sometimes called the brokers), for the purchase of 10,000 shares at $5.82 1/2; that the offer was fair and reasonable; that it was in the best interests of the estate that the offer be accepted; that some part of the personal property of the estate had to be sold to pay the specific bequests provided in the will; and that the offer made by the brokers was the best offer that could be received. In the second of these petitions the executor represented that it had received another offer from the brokers to purchase an additional 5,000 shares at $5.82 1/2; that it was for the best interests of the estate to accept the offer; and *254 that the additional 5,000 shares should be sold so that the estate would have sufficient funds to pay the costs of administration, the widow's allowance and the special bequests. The price of $5.82 1/2 per share was arrived at by splitting the difference between $5.80 (the bid price on the Spokane Standard Stock Exchange on June 23, 1934) and $5.85 (the asked price on that Exchange on the same day). The executor further petitioned the Superior Court to authorize it to give the brokers an option to purchase 70,000 additional shares at $6.90 per share and the court's order granted that request. The price of $6.90 was computed by adding approximately a dollar to the price agreed upon for the outright sale of the 15,000 shares. The brokers exercised the option given to them at the time and in the manner reflected by the record of sales set forth above. The brokers were given options by the four principal stockholders, covering approximately 40 per cent of their holdings, which totaled 405,000 shares, which included 70,000 shares belonging to the estate. Each of the options was dated June 30, 1934, and provided that the options were to continue in force and effect from June 30, 1934, until *255 four months after the listing of the stock of the Sunshine Mining Co., on the New York Curb Exchange, but in no event beyond December 31, 1934. The option agreements further provided that the option was subject to the brokers' appointing an engineer, receiving the engineer's report on the Sunshine Mining Co.'s property, and completing the listing of the stock on or before September 1, 1934. An engineer was employed by J. & W. Seligman Co., a New York firm for whom the brokers were acting. The engineer arrived at the Sunshine Mine on July 14, 1934, and conducted his investigation from that date to July 18, 1934. His report, which was submitted to the New York Curb Exchange, was dated July 20, 1934. The application for the listing of the stock on the New York Curb Exchange was signed on June 27, 1934, and the stock was listed on August 9, 1934. Negotiations had been commenced to list the Sunshine Mining Co. stock on the New York Curb Exchange as early as November 1933, as it was believed that such a step would enhance the value of the stock. Because of decedent's strenuous opposition to this procedure, although other directors of the company were in favor of it, this plan was not consummated *256 until after the death of decedent. The whole process by which the options were granted and which culminated in the stock being listed on the New York Curb Exchange was kept as secret as possible. The Sunshine Mine lies in Shoshone County, Idaho, within the Coeur d'Alene mining district. The Sunshine Mining Co. purchased the property in 1920 and owns in fee 210 acres and a patented mill site of 4.778 acres. The Sunshine Mine is well situated for transportation and power facilities. On June 7, 1934, there were two shafts from the adit level of the Sunshine Mine. One was a vertical shaft which extended down to the 500 foot level; the other was a two-compartment incline shaft which extended to the 1,900 foot level. From the 1,900 foot level a vertical winze had been sunk to a depth of 475 feet with a station cut at the 2,100 foot level and another station started at the 2,300 foot level. These levels are driven at 200 foot intervals. Drifting on the 1,900 foot level had progressed laterally eight or nine hundred feet, both to the east and west. It later was developed to a length of about 1,600 feet. As of June 7, 1934, the vein on the 2,100 foot level had been cut and drifting had progressed *257 from 8 to 10 feet to the west and to a slightly greater extent to the east; although the 2,100 foot level had not been opened up for actual mining operations, decedent had seen the development on the 2,100 foot level shortly before he died. The general physical condition of the mine was in poor shape and the equipment was in need of repair. Because of smoke conditions and lack of direct ventilation, it was possible to work only one shift. There was danger of the shaft caving in and causing a catastrophe. The mine was capable of being operated more efficiently, and both production and profits could be increased, if certain repairs and changes in mining methods were made. The only difference in the physical condition of the Sunshine Mine on July 14, 1934, when the engineer commenced his investigation and on June 7, 1934, was that the 2,100 foot level had been developed to a lesser extent on June 7, 1934. The only significance of the more advanced stage in the development of the 2,100 foot level on July 14, 1934, was that it permitted the engineer to be more certain of the value of the ore on the 2,100 foot level. The difference in time did not affect his other conclusions based upon *258 the geology of the mine. The mine did not change materially either in value or in any other respect during that period. The examination of the Sunshine Mine from July 14, 1934, to July 18, 1934, conducted by the engineer disclosed that the June average head assays were 30 ounces per ton and that the head assays would gradually increase during the balance of 1934 due to the bringing in of the 2,100 foot level, where the vein appeared much stronger than it did at a corresponding point on the 1,900 foot level. The silver content was also found to increase with depth. The following chart illustrates the available ore without regard to ore below the 2,100 foot level: Positive (above the 1,900 foot level)
249,000 tons
8,964,000 ounces or 36 ounces per ton
Probable (from 1,900 foot level to 2,100
foot)
257,000 tons
5,654,000 ounces or 22 ounces per ton
Possible (all ore taken on margins)
55,000 tons
825,000 ounces or 15 ounces per ton The engineer came to the conclusion that commercial ore would be found far below the then contemplated development; that the mine could produce three to four million ounces of silver per year at a cost of 20 cents per ounce; that the increasing *259 silver content of the ore would offset normal rising costs; that the tonnage milled per year could be easily increased; that by the use of proper methods, an additional 561,000 tons of ore containing higher silver values would be developed within a period of 12 months. It was therefore apparent that approximately a half a million tons of ore were available; that this would result in approximately 15,000,000 ounces of silver; that, the profit on each ounce of silver being 40 cents, the value of the mine was approximately $6,000,000; and that this value could be increased by an additional $6,000,000 by reasonable development. Pursuant to the recommendation made by the engineer, a diamond drill was set up near the bottom of the winze and horizontal holes were drilled to prove the presence of the vein at the 2,300 foot and 2,500 foot levels. This work was commenced in August 1934 (before the brokers exercised any of the options). It was completed in November 1934, and proved the existence of the vein at the 2,300 foot level and confirmed the engineer's conclusions as to the value of the mine. In its report of August 21, 1934, the Sunshine Mining Co. advised its stockholders of the results *260 and recommendations contained in the report of the engineer dated July 20, 1934, and further stated that on August 15, 1934, the horizontal hole on the 2,300 foot level encountered a vein, an analysis of which disclosed 40 ounces of silver per ton of ore. On November 10, 1934, the Sunshine Mining Co. reported to its stockholders that the drilling had resulted in proving the existence of the vein at the 3,000 foot level and that the drifting on the 2,100 foot level showed positive ore which was more persistent and richer in silver content than it had been in any other level. As of January 1, 1934, A. E. Larson submitted a credit statement to the Yakima First National Bank in which he listed among his assets 210,974 shares of Sunshine Mining stock at $210,974. In April or May 1934, in connection with certain loans made by the Yakima First National Bank to A. E. Larson, the latter, together with one Alexander Miller, a vice president of the Sunshine Mining Co. and of the Yakima First National Bank, evaluated Sunshine Mining stock, which was to be pledged as collateral, at $2.50 per share. About April or May 1934, Alexander Miller sold 1,000 shares of Sunshine Mining Co. stock at $6 *261 per share. At the time of this sale he expressed the opinion that he was receiving $2,000 more than the stock was worth. The trend of the market on Sunshine Mining Co. stock throughout 1934 and the first half of 1935 was strongly upward, following the silver proclamation by the President of the United States on December 21, 1933, whereby the price of newly mined silver was fixed at $1.29 an ounce, of which one-half was to be taken in seigniorage, so that the price amounted to $.646 per ounce. The stock was traded on the Spokane Standard Stock Exchange during the month of June 1934. The bid price and the asked price on the morning of June 7, 1934, were $5.56 and $5.58, respectively; in the afternoon of the same day the bid price was $5.49 and the asked price was $5.51. Twenty-five hundred shares were traded on June 7, 1934. The highest bid in the month of June 1934 was made on June 14 at $5.96 as against an asked price of $6, the lowest bid in the month of June 1934 was made on June 12 at $5.30, as against an asked price of $5.40. The average bid for June 1934 was $5.69 and the average asked price was $5.76. The market for Sunshine stock on the Spokane Standard Stock Exchange was *262 narrow, and dealings in the stock were very much larger in volume. The bulk of the business in stock selling in the Spokane area was done over the counter. During June 1934, 17,504 shares were sold on the Spokane Standard Stock Exchange. E. J. Gibson & Co., a local brokerage firm, the largest western dealer in Sunshine Mining stock, sold 234,242 shares during 1934, including 28,865 shares in June, and 8,115 shares in July, at a high for those two months of $6.05 per share. The sales of that company were 169,293 shares for the first six months of 1934, and 64,949 for the last six months. These amounts, prior to the New York listing, represent approximately 50 per cent of the total sales of all brokers of this stock during that period. That company, prior to the listing on the New York Curb, handled as much as 40,000 shares of Sunshine stock a month, 25,000 shares many months. It did not sell much on the Spokane Exchange. By June 23, the bid and asked prices on the Spokane Exchange had risen to $5.80 and $5.85, respectively. Prices on the exchange set the prices for over-the-counter transactions. Substantial over-the-counter sales of Sunshine stock were made during the first five months *263 of 1934 at prices which ranged from a low of $4.75 to a high of $6.60. If approximately 100,000 shares of Sunshine stock had been offered for sale on the Spokane Exchange immediately after the death of A. E. Larson, the price received upon such a sale would have been less than the fair market value of the stock. It would not have been unreasonable for a purdent executor to have taken approximately six months within which to dispose of 100,000 shares of this stock. The stock of the Sunshine Mining Co. was listed on the New York Curb Exchange on August 9, 1934, and trading in that stock commenced on August 13, 1934. The stock opened on August 13, 1934, at 8 1/4, reached a high of 8 5/8, and a low of 8 1/4, and closed at 8 1/2. During the month of August 1934, the stock never went below 7 1/2. In September 1934, its average was over 8 1/2; in October 1934, its average was over 9 1/2; in November 1934, its average was over 11, and in December 1934, its average was over 12. From August 13, 1934, to December 31, 1934, 321,500 shares were sold on the Curb. The engineer, who commenced his examination of the mine on July 14, 1934, purchased 1,000 shares of Sunshine stock on July 15, 1934, *264 at $5.85 per share, and an additional 1,000 shares on July 16, 1934, at $6.05 per share. The president of the Sunshine Mining Co., who was also president of the Yakima First National Bank (the executor of the estate) and of the Yakima Holding Co. (which owned control of the Yakima First National Bank), purchased 4,500 shares of Sunshine stock within 90 days after the death of A. E. Larson at prices varying from $6 per share to $9 per share. The Yakima Holding Corporation was advised in August 1934 by a vice president of the Sunshine Mining Co., who was also vice president and a member of the executive committee of the Yakima First National Bank, and an appraiser of the estate of A. E. Larson, to purchase the 5,000 shares of Sunshine stock at $8 per share, which he had sold to the brokers under the option agreement at $6.90 per share. The inventory and appraisal of the estate was dated November 24, 1934, [2] and filed on November 26, 1934, by the appraisers appointed by the Probate Court. The 15,000 shares of Sunshine Mining Co. stock which had been sold at $5.82 1/2 per share, were returned at $5.82 1/2 per share by the appraisers; the remaining 195,974 shares, which included the *265 70,000 shares which had been optioned to the brokers on June 30, 1934, at $6.90 per share (some of which options were exercised before the filing of the appraisal and others thereafter), were all returned at $6.90 per share. The value for appraisal of the shares sold prior to appraisement was fixed by statute. [3]
The estate tax return (Form 706) for the estate of A. E. Larson was filed on February 16, 1935, with the collector of internal revenue for the district of Washington, at Tacoma, Washington. (Sunshine stock on that day on the New York Curb Exchange closed at 12 1/4.) Schedule B of that return listed the 210,974 shares of the Sunshine Mining Co. and put the fair market value at the time of decedent's death of 15,000 such shares at $5.82 1/2 per share and the remaining *266 shares at $6.90 per share. That return was investigated by a revenue agent who rendered a report dated July 16, 1935, to the internal revenue agent in charge at Seattle, Washington. That report, in so far as it relates to the value of the Sunshine Mining Co. stock as of June 7, 1934, is as follows: "Items 13 to 38. Sunshine Mining Stock. "Returned at $6.90 per share. Standard Stock Quotation shows this stock as of 6-9-34 at B 5. 40 A 5.60. Another quotation as of 6-6-34 shows B of 5.70 and A 6. Easter & Company, Seattle, during June, 1934, show B of 5.75 and A 6. Mr. Parker states the stock is now being placed on the NY stock market. The most of this stock has been sold by the executors to pay estate bequests, etc., practically every share sold being at 6.90. The entire lot could have been sold at this price which was shortly after date of death. The sale price is the more representative of the market as there is very little stock handled by brokers, and on the Spokane Exchange and Seattle Mining Exchange. The estate returned the stock at the price sold of 6.90 which is recommended. The stock is now much higher." A letter dated January 24, 1936, was *267 sent to the executor by the Deputy Commissioner of Internal Revenue in which the executor was advised that a deficiency in the Federal estate tax liability of the estate of A. E. Larson was being proposed as a result of an examination of the return, Form 706, the revenue agent's report, and other data on file. Part of that proposed deficiency resulted from raising the fair market value of the 15,000 shares of Sunshine Mining Co. stock which had been returned at $5.82 1/2 per share to $6.90 per share. That proposed deficiency was paid in full by the estate of A. E. Larson without objection on April 23, 1936. No claim for refund was ever filed. A claim for refund would have been filed, if it had been known that the Commissioner would later take the position that the stock was worth only $4 a share on the date of decedent's death. The income tax return (Form 1040) for the estate of A. E. Larson for the period from June 8, 1934, to December 31, 1934, was filed with the collector of internal revenue at Tacoma, Washington, on May 28, 1935. The return disclosed a disposition during that period of 85,000 shares of stock of Sunshine Mining Co. No gain or loss was claimed as a result of the *268 disposition of these 85,000 shares. The deficiency notice with respect to this return was issued May 16, 1940. It adds to the income of the estate of A. E. Larson for the period from June 8, 1934, to December 31, 1934, the sum of $230,375, which the Commissioner determined to be the profit on the sale of these 85,000 shares of the stock of the Sunshine Mining Co. The value at the time of decedent's death of each share was determined by the Commissioner to be $4. The fair market value of the stock of the Sunshine Mining Co. on June 7, 1934, was $6.90 per share. Opinion What was the fair market value on June 7, 1934, of the 15,000 shares of Sunshine Mining Co. stock later sold for $5.825 per share and the 70,000 shares still later sold for $6.90 per share? In the estate of A. E. Larson it was appraised at $6.90 per share for purposes of Federal estate tax. The petitioner contends, under the language of Regulations 103, article 19.113 (a) (5)-1 that, "the value of property as at the date of the death of the decedent as appraised for the purpose of the Federal estate tax * * * shall be deemed to be its fair market value at the time of the death of the decedent," though such presumption *269 is only prima facie and may be rebutted. The respondent on brief seems to agree, citing Anson Evans et al., Trustees, 29 B.T.A. 710, to the effect that the appraisal is not conclusive. The evidence that the appraisal does not represent the fair market value should be convincing. Anson Evans et al., Trustees, supra;Stella H. McConnell, 29 B.T.A. 32; David Williams, 15 B.T.A. 227; Northport Shores, Inc., 31 B.T.A. 1013. We are not convinced that the appraised value has been shown to be incorrect and have found that the fair market value of the common stock of Sunshine Mining Co., herein involved, was $6.90 per share on June 7, 1934, the date of the death of A. E. Larson. As the question is one of fact, it seems unnecessary to recite at great length the considerations which have led us to the conclusion reached. Suffice it to say that we have examined and considered all of the factors presented in the evidence, including the price of the stock, on the Spokane Standard Stock Exchange on June 7, 1934, and the amount of sales both *270 over the counter and on the Spokane Exchange, the physical conditions in the mine, the upward trend in the silver market prior to, at, and after, June 7, 1934, the amount of stock involved in the sales, the amount of time reasonably necessary to dispose thereof, the limited capacity of the local market, on the Spokane Exchange, and the much larger market over the counter, the desire of stockholders other than A. E. Larson at the date of his death to list the stock on the New York Curb Exchange, and the fact that in pursuance of that desire proceedings, kept as secret as possible, were immediately started, leading to listing on the New York Curb, the sale of 15,000 shares and the option and later sale of 70,000 shares. From all of this and other related elements of the evidence, we are convinced that the figure of $6.90 represents a fair market value on the crucial date, and that the evidence does not overcome the presumption of correctness of that figure. That the value of $4 per share for which the respondent contends is altogether too low appears to us apparent. On the date of A. E. Larson's death, the bid and asked prices were approximately from $5.49 to $5.58 per share, and 2,500 *271 shares were traded in on that date. The over-the-counter market was very much greater, the bulk of the stock market business in the Spokane area being over the counter. We have stated this fact conservatively, we think. One witness testified that 90 per cent of the business done was over the counter; another that his company, the largest dealer in Sunshine stock, did not sell much on that exchange. Exchange prices set the price for over-the-counter transactions. Though 85,000 shares could not have been dumped on the market on June 7, 1934, and such a price secured, yet, if, under the salutary idea of a reasonable time given for sale of a block of stock, the 85,000 shares here involved had been fed into the market, both over the counter and on the Spokane Exchange, it appears from the record reasonable that before the year was out, it could have been disposed of at an average price of as much as $6.90 per share (even had there been no listing on the New York Curb); for on the Spokane Exchange, together with "over-the-counter," the sales for June 7, 1934, were, under the evidence, at least 5,000 shares. During June, 17,504 shares were sold on the Spokane Exchange alone. At such rate *272 about 245,000 shares would have passed over such exchange and over the counter during the last seven months of 1934, even without the Curb listing. E. J. Gibson & Co. sold 28,865 shares in June and 8,115 shares in July, prior to the Curb listing, at a high of $6.05; and others sold about the same amount. The head of that company testified that it could have sold 100,000 shares at $7 in the course of four to six months, without the listing on the eastern exchange. Its sales for the first six months of the year were 169,293 shares as against 64,949 for the last half of the year, plainly some indication of an active market before the Curb listing. It seems altogether fair and reasonable to believe that on such a market, even without the Curb listing, over a period of about six months, up to practically the close of 1934, 85,000 shares could have been fed into the market without disturbance of upward trend, therefore that the fair market value should be something above the high of $5.58 on June 7. During June, $6 was asked and $5.96 offered. By June 23, the bid and asked prices had risen to $5.80 and $5.85, long before the listing on the New York Curb. On July 15, the engineer who had *273 examined the mine paid $5.85 for 1,000 shares, and on July 16, $6.05 for another 1,000 shares. This was more than a month before any listing on the New York Curb. The options preliminary to listing on the Curb had been kept as secret as possible. Substantial sales had been made over the counter even prior to decedent's death, during the first five months of 1934 at from a low of $4.75 to a high of $6.60. The upward trend of the market on Sunshine Mining stock following the silver proclamation by the President of the United States in December 1933, must be given weight in evaluating the value on the crucial date. Elizabeth G. Augustus, 40 B.T.A. 1201 (1208, where a price trend was considered in concluding that the value determined for estate tax purposes was too low. Market prices after the crucial date contribute to "demonstrate that a reasonably efficient liquidation of the stock" after the crucial date would furnish a fair test of value. Mott v. Commissioner, 139 Fed. (2d) 317. We have, as above seen, considered only the sales prior to the Curb listing, considering it unnecessary, under the facts in this case, to consider *274 effect of a market not existing at the date of death. However, we do consider, as entering into value on the basic date, the indications at that date that the stock would be listed on the New York Curb (to the betterment of market price, under the evidence of from 50 to 100 per cent). Such a probability clearly is not without weight on the question of value on the basic date. The fact that the stock was actually placed on the New York Curb, as desired by heavy stockholders prior to Larson's death, and the fact that on such Curb market the price was as an average much above the figure adopted by us, demonstrate that at his death there was probability of such listing, and that it had value for the stock. That Larson had earlier listed the stock in his assets in a credit statement to a bank, of which he was vice president and director, as low as $1 per share, and again had advised the bank that he considered the stock worth $2.50, is not fairly representative, we think, of the value. Loans were made on the latter basis, and we think that was the purpose of the estimate. Though the testimony on the point is contradictory, the witness on the subject, referring to Larson, said: "Well, Mr. *275 Murray, it wasn't the question I asked how much we should loan. I asked him the fair value of the stock so that we could use that as a basis to loan on. Q. For collateral? A. Yes." Larson was apparently conservative and cautious. The opinion of Samuels, the mine superintendent, was based also on conservative lines and upon more or less proven ore. We do not think it should prevail as against the reasonable possibilities of development of the mine, and actual market sales at that time. Miller's idea of $4 per share obviously can not be taken at face value, since the 1,000 shares sold by him was no large block, and the market at about that time was at a greater figure. He actually sold at $6 per share about April or May 1934. The buyer's opinion apparently was that the stock was worth $6, in effect offsetting that of Miller. The property involved being a mine, the previous earnings, for purposes of capitalization of earnings, lend less weight to the conclusion than in case of a going commercial business, the worth of which lies in activities such as sales, rather than in development and sale of certain physical property. Considering the evidence as a whole, we have come to the conclusion *276 that $6.90, as above stated, represented fair market value on the date of Larson's death. This conclusion renders it unnecessary to discuss the estoppel question presented upon brief, and applies the statute of limitation. Decision will be entered under Rule 50. Footnotes
1. Rose B. Larson, 44 B.T.A. 1094; affd., 131 Fed. (2d) 85↩.
2. The prices for the stock on the New York Curb Exchange on November 24, 1934, the day on which this appraisal was made, ranged from a low of 11 3/4 to a high of 12 1/8. ↩
3. Section 1493 of Remington's Revised Statutes of the State of Washington (1932 Ed.) provides in part as follows: "* * * Where personal property is sold prior to appraisement, the sale price shall be deemed the value for the appraisal. * * *"↩