WILLIAM O. ADAIR AND FLORENCE O. ADAIR, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Adair v. Commissioner
Docket Nos. 3881-79; 9235-79; 22777-81; 22778-81.
United States Tax Court
T.C. Memo 1987-494; 1987 Tax Ct. Memo LEXIS 491; 54 T.C.M. (CCH) 705; T.C.M. (RIA) 87494; September 28, 1987. *491 In T.C. Memo. 1985-392, it was determined that stock received by petitioners in docket No. 3881-79 pursuant to the exercise of an option is ordinary income to the extent of the excess of the fair market value over the amount paid for the stock. It was also determined that the entire amount of stock received by petitioners in docket No. 9235-79 is subject to the imputed interest rules of sec. 483. Held: Fair market value of such stock determined as of the applicable dates. H. G. Sparrow III and Thomas D. Hammerschmidt, Jr., for the petitioners in docket No. 3881-79. Stephen Wasinger and Richard S. Soble, for the petitioners in docket No. 9235-79. Michael K. Cavanaugh and Robert E. Arroyo, for the petitioner in docket Nos. 22777-81 and 22778-81. Jaqueline M. Hotz, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION *492 WHITAKER, Judge: The facts of this case were previously set forth at T.C. Memo. 1985-392, which along with the stipulated facts are incorporated by reference and will be summarized here only as necessary for this opinion. The remaining issue is the fair market value of Clow Corporation $ 6 Series A convertible preferred stock (Series A preferred stock) on March 2, 1973, and March 30 or April 2, 1973. For convenience, the Findings of Fact and Opinion are combined. On March 25, 1970, a merger was effected between Clow Corporation (Clow) *493 and Vulcan Corporation (Vulcan) whereby all the stock of Vulcan was exchanged for 16,500 shares of Clow Series A preferred stock. An additional 16,500 shares of Series A preferred stock were to be issued to the former Vulcan shareholders if Vulcan attained a certain level of profits for its fiscal year ending in 1972. Prior to January 24, 1969, all Vulcan stock had been owned by Donald R. Borgeson, (one of the petitioners in docket No. 9235-79), who on that date caused a stock bonus to be issued to those other persons listed below, who were all key employees. [2] Thereafter, Vulcan's 11,500 shares outstanding were owned as follows: Name
Shares
Percentage
Borgeson
10,400
93.27 Alf
420
3.77  Washington
190
1.70  Drayton
50
.45   Adair
30
.27   McAllister
30
.27   Dean
30
.27   11,150
100.00
At the end of its 1972 fiscal year, Vulcan did in fact attain the level of profitability which entitled its shareholders to the entire number of contingent shares contemplated in the merger agreement. These shares were distributed *494 on March 2, 1973, as follows: Name
Shares
Borgeson
15,389
Alf
622
Washington
280
Drayton
74
Adair
45
McAllister
45
Dean
45
On January 10, 1972, in consideration for their past performance as employees of Vulcan, Borgeson granted each Adair petitioner and two other individuals (see n. 3) an option to purchase a portion of his contingent shares at 25 cents per share. The number of contingent shares to which each would be entitled under the option could not be determined until it could be ascertained how many shares of contingent stock Borgeson would receive. When it was found that the maximum number of shares were earned, Borgeson gave written notice to each of the optionees concerning the 7,438 shares which would be the subject of the options. On either March 30 or April 2, 1973, each of these individuals exercised his or her option and thereafter received the following number of shares: Name
Shares
Amount Paid
Alf
2,730
$ 682.50
Washington
2,420
605.00  Drayton
926
231.50  Adair
455
113.75  McAllister
455
113.75  Burton
113
28.25   Crawford
113
28.25    [3] Baker 113
28.25   [3] Sempowski 113
28.25   *495 Clow redeemed these contingent shares from the optionees on October 8, 1973, at a price of $ 70 per share. Having decided in our earlier opinion that the receipt of the contingent shares by the Adair petitioners is compensation to be taxed under the provisions of section 83, [4] it is left for us to decide the fair market value of the stock on the date that the options were exercised. In addition the value of the 15,389 shares of Series A preferred stock received by Borgeson on March 2, 1973, must be found for the purpose of determining the amount of imputed interest pursuant to section 483, which is taxable to him as decided in our earlier opinion. Central to the issue of valuation is the nature of the asset to be valued. In this case, the stock was preferred stock which was convertible into common stock of Clow on the basis of four shares of common for every share of preferred. The class of preferred stock issued *496 was subordinate to one other class of preferred stock. It could be redeemed at the election of Clow beginning April 1, 1975, at an initial redemption price of $ 103 per share, the redemption price declining on each April 1 by 60 cents until a final redemption price of $ 100 per share was reached on April 1, 1980. The stock was restricted under the securities laws and bore a legend as follows: This security has not been registered under the Securities Act of 1933. It has been acquired for investment and may not be sold or transferred in the absence of an effective registration statement with respect thereto under the Securities Act of 1933 or an opinion of counsel satisfactory to the company that registration is not required under said Act. [5]
We begin by recognizing that the value of a security, or indeed any asset, is a question of fact. Estate of Gilford v. Commissioner,88 T.C. 38, 50 (1987); Estate of Andrews v. Commissioner,79 T.C. 938, 940 (1982). *497 However, the criteria that we use to arrive at an asset's fair market value is a matter of law. Morris v. Commissioner,761 F.2d 1195, 1200 (6th Cir. 1985), affg. a Memorandum Opinion of this Court. In the valuation area, expert testimony is most helpful to the finder of fact and is admissible if and because it will assist the trier of fact to understand evidence that will determine a fact in issue. See Fed. R. Evid. 702. Expert testimony must, however be viewed in light of the demonstrated qualifications of the expert and all other evidence of value. Estate of Christ v. Commissioner,480 F.2d 171, 174 (9th Cir. 1973), affg. 54 T.C. 493 (1970). We are not bound by expert testimony which is contrary to our judgment, Kreis' Estate v. Commissioner,227 F.2d 753, 755 (6th Cir. 1955), affg. a Memorandum Opinion of this Court, and may either embrace or reject expert testimony, whichever in our judgment is appropriate. Helvering v. National Grocery Co.,304 U.S. 282 (1938). Likewise, we need not accept one expert's opinion in its entirety, or to the exclusion of all others. *498 Parker v. Commissioner,86 T.C. 547, 562 (1986). The parties here have presented us with a wealth of expert testimony, and the experts are in fact in agreement on many points. Given the points on which the experts agree, the facts of the case which are undisputed, and the inherently factual nature of such a case, we find it difficult to understand why the parties could not find a more efficient route by which to arrive at a resolution of their dispute. It is well settled that fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." United States v. Cartwright,411 U.S. 546, 551 (1973); sec. 20.2031-1(b) Estate Tax Regs. [6] In valuing stock which is sold on an active market, section 20.2031-2(c)-(e), Estate Tax Regs., sets forth a three-fold test. First, we look to any stock exchange upon which the stock may be traded for actual sales. If no actual sales prices are available, we look to the mean of the bid and asked prices of the stock on the over-the-counter market. If this *499 figure does not reflect the fair market value of the stock, "reasonable modifications of the selling prices or the bid and asked prices may be considered." (Fn. ref. omitted.) Estate of Gilford v. Commissioner, supra at 49-50. The Court of Claims has held that even though a convertible security is restricted and not traded on an established market, it is still appropriate to utilize the market on which the underlying common stock was traded as a starting point. Campbell v. United States,661 F.2d 209, 225 (Ct. Cl. 1981). We think this the proper approach in valuing the Series A preferred. Valuation of Adair Petitioners' Stock
Each of the expert witnesses determined a value for the Adair petitioners' stock as if all 7,438 shares of contingent stock were a single block. This issue is specifically addressed by regulation in the gift tax area. Section 25.2512-2(e), Gift Tax Regs., requires that each one of several gifts made on the same day be valued *500 on the basis of each separate gift. See Calder v. Commissioner,85 T.C. 713 (1985); Rushton v. Commissioner,60 T.C. 272 (1973), affd. 498 F.2d 88 (5th Cir. 1974). In Rushton, we declined to consider the effect upon the market that the simultaneous sale of several blocks of stock, each the subject of a separate gift, would have upon the market price. Rushton v. Commissioner, supra at 278. We noted our consistency in valuing gifts separately, and we decline to depart from that course now. [7]
The experts are in general agreement that the only ways to dispose of the Adair petitioners' stock were: (1) registration and public sale; (2) private placement; or, (3) "dribbling out" under Rule 144, S.E.C. [8] The experts differed in their opinions as to the feasibility of each of these methods. Looking at their individual holdings, we think *501 that none of the Adair petitioners could register their stock for public sale nor would their stock be attractive to any private investor. Their individual holdings were not nearly so large as to make registration and public offering worthwhile. Likewise, we find that no institutional or sophisticated investor would find it worthwhile to invest in such meager holdings. Therefore, we find that the only option open to the Adair petitioners on March 30 or April 2, 1973, was to convert the stock and sell under Rule 144, S.E.C. [9]
*502 In basing our valuation on an established market price, it is necessary to establish exactly what the market price was on the applicable valuation dates. As Clow common stock was traded over-the-counter, there are no records of actual sales, but rather only bid and asked prices. The regulations therefore require us to look at the mean of the bid and asked prices to determine the market value of the stock on the applicable valuation date. On March 20, 1973, the bid and asked prices were $ 16.50 and $ 17, respectively, for a mean price of $ 16.75 and a conversion value [10] of $ 67. Having determined a pre-adjustment value for the Adair petitioners' stock, we proceed to determine the applicability of any discounts for blockage, lack of marketability, or securities law restrictions. Once again, looking at the Adair *503 petitioners' individual holdings, we find none of them hold so much stock as to be unable to dispose of it in a reasonable period of time without depressing the market. Sec. 20.2031-2(e), Estate Tax Regs. Clow had more than 2.9 million shares of common stock outstanding, and Alf, who was the largest holder of contingent shares with the exception of Borgeson, would have had only 10,920 common shares upon conversion, or less than .4 percent of the outstanding shares. Therefore, a blockage discount is inappropriate. See Van Horne v. Commissioner,720 F.2d 1114 (9th Cir. 1983), affg. 78 T.C. 728 (1982). Further, because of the ability of the Adair petitioners to dribble out their stock onto an established market under Rule 144, S.E.C., we find that there is no applicable discount for lack of marketability. Finally, since we are valuing the stock in the hands of the Adair petitioners for purposes of section 83 (which mandates that fair market value be determined without regard to any restriction other than one which by its terms will never lapse), we take into consideration no discount for those restrictions imposed by the securities laws. Pledger v. Commissioner,71 T.C. 618 (1979), *504 affd. 641 F.2d 287 (5th Cir. 1981). We therefore find that the fair market value of the Series A convertible preferred stock, on March 30 and April 2, 1973, [11] is $ 67 per share. Valuation of Borgeson's Stock
Next we turn to the fair market value of the stock on March 2, 1973, for purposes of Borgeson and the interest imputed to him under section 483. Because of the size of Borgeson's block of stock, we arrive at a different value than that which was determined for the Adair petitioners. The size of Borgeson's block may have made disposition of his stock in a private placement or through registration and public sale more feasible. [12] Nevertheless, we think it appropriate to follow Campbell v. United States,661 F.2d at 221 (Ct. Cl. 1981), [13] and value Borgeson's stock on the basis of the market price of the underlying common stock. [14] Although we value Borgeson's stock as if disposed of under Rule 144, S.E.C., we must undertake a fresh analysis of the applicability of any discounts due to the size of the block. *505 Our task becomes less complicated if we can first eliminate any discounts which we find inappropriate. Because of the approach we take in valuing Borgeson's stock, we find that there should be no discount for the restricted nature of this Series A preferred, notwithstanding the fact that the stock would retain its restricted nature after conversion while still in Borgeson's hands. Under Rule 144, S.E.C., Borgeson would be able to publicly dispose of up to 29,147 shares of common stock [15] free of restrictions in the 6-month period beginning March 2, 1973, and each 6-month period thereafter until his holdings were liquidated. Any "reiteration" on the disposition of such stock does not arise as a direct result of the securities laws but rather is a result of the volume limitations imposed by Rule 144, S.E.C.; the buyer of such stock is not concerned with the stock's restricted nature since such restrictions do not pass with the stock. The volume limitation deprives all but 29,147 shares of Borgeson's common stock of a market until 6 months after March 2, 1973. [16] The discount therefore more accurately expresses itself as one for the lack of marketability. *506 Respondent's expert, Edward Bard, concluded that no discount either for the restricted nature of the stock or the lack of marketability is appropriate. Because of the fact that Borgeson could not sell, after conversion, a majority of his shares under Rule 144, S.E.C., for at least 6 months, or would have had to allow any institutional investor a discount for the restrictions retained by the stock in any private placement, we think Bard's determination is erroneous. Clow's expert, Jacob Roosma, did not consider a discount for lack of marketability, but did determine that the restricted nature of the stock commanded a 33-percent discount. However, Roosma did not undertake a valuation based on the market value of the underlying common stock. We agree in concept with the expert for Borgeson, Charles Moore, in valuing the Series A preferred based upon the market value of the underlying common stock as adjusted for the lack of ready marketability and a blockage factor. Moore valued the Series A preferred as if Borgeson's stock was actually three different blocks for purposes of applying a marketability discount. Since Borgeson could have disposed of 29,147 shares of common stock in *507 the 6 months beginning March 2, 1973, Moore determined no discount for lack of marketability to that extent. However, Borgeson could not have disposed of his second partial block of 29,147 shares until 6 months after the valuation date, a factor for which Moore allowed a 20-percent marketability discount. Finally, Borgeson would have held 3,262 shares which he could not have disposed of until 1 year after the valuation date, for which Moore allowed a 30-percent discount. We are in agreement with Moore's ascending marketability discount, since the risks inherent in holding the stock increase along with the period of time during which the stock cannot be disposed of. Due to the fact that Bard and Roosma expressed no opinion concerning this approach, and given what we find to be the soundness of Moore's reasoning, we agree with and apply his incremental marketability discounts to the conversion price of $ 16.125, although we find discounts of 15 percent and 30 percent for each partial block of stock are more appropriate. We must next decide upon an appropriate blockage discount, if any. In determining the applicability of such a discount, we are guided in part by the regulations *508 at section 20.2031-2(e), Estate Tax Regs.: In certain exceptional cases, the size of the block of stock to be valued in relation to the number of shares changing hands in sales may be relevant in determining whether selling prices reflect the fair market value of the block of stock to be valued. If the [petitioner] can show that the block of stock to be valued is to large in relation to the actual sales on the existing market that it could not be liquidated in a reasonable time without depressing the market, the price at which the block could be sold as such outside the usual market, as through an underwriter, may be a more accurate indication of value than market quotations. * * * The regulations and cases have contemplated various factors to be taken into account in determining the fact and extent of any blockage discount. Among those factors which have been considered are the sizes of the block as compared to the number of shares outstanding, Van Horn v. Commissioner,78 T.C. 728 (1982), affd. 720 F.2d 1114 (9th Cir. 1983), the amount of trading activity, [17] and whether large portions of the stock were held by management of the corporation. *509 [18] Clow Corporation had 2,914,700 shares of common stock outstanding, of which Borgeson's holdings, if converted, would have constituted approximately 2.1 percent. Both Moore and Roosma have provided us with evidence of average trading volumes; however, Roosma's figures reflect quarterly trading volumes only through the end of 1972, while Moore's figures reflected the market activity beginning 4 weeks before March 2, 1973, and more accurately demonstrate an average weekly trading volume of 5,700 shares. Neither Bard nor Roosma found a discount for blockage appropriate, although Moore assigned a discount of 15 percent. After conversion, Borgeson's block of 2.1 percent of Clow's outstanding common shares would be roughly equal to 11 weeks trading volume. These factors warrant a blockage discount, but not so large as that urged by Moore. Blockage discounts have been denied by this Court when the block of stock to be valued is less than 1 percent. Estate of Van Horne v. Commissioner,78 T.C. 728 (1982), *510 affd. 720 F.2d 1114 (9th Cir. 1983). Conversely, we have found a discount of 15 percent appropriate for both blockage and resale restrictions only when the block of stock to be valued is substantially larger.[19] We have found blockage discounts of 8 percent for blocks similar in size to that held by Borgeson. [20] Additionally, if Borgeson were to spread out his stock sales as evenly as possible, given the time and volume limitations of Rule 144, S.E.C., [21] he would add over 1,100 shares per week to a market trading only 5,700 shares per week, an increase of almost 20 percent. This would certainly have some effect upon the market, which, after consideration of the cited facts and relevant case law, we find to be a discount of 5 percent. Making the following computations, we arrive at a fair market value per common share of $ 13.99, and a fair market value per preferred share of $ 55.96. *511 Market
Market price
Ability
Blockage
Common
Blocks
Common 3/2/73 X
Factor X
Factor X
Shares =
Value
I  16.125
0% 95%
29,147
$ 446,495.61
II 16.125
85%
95%
29,147
379,521.27
III
16.125
70%
95%
3,262
34,978.83
TOTAL
61,556
$ 860,995.71
Price per common share
$ 13.99     Price per preferred share
$ 55.96     While the difference between the value at which we arrive here and the value determined under a different approach may be more than negligible, we feel that our determination is certainly within the confines of acceptable error attendant upon such a "Solomon-like pronouncement." See Estate of Gilford v. Commissioner,88 T.C. 38, 50 (1987); Messing v. Commissioner,48 T.C. 502, 512 (1967). We find the approach taken here to be at least as accurate as any other method urged upon us. Unless another method is shown to be superior in its accuracy, we prefer to utilize that which provides the parties with a greater degree of certainty in such an ambiguous area, and which may be more conducive to settlement of such cases. Decision will be entered *512 under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated for trial, briefing, and opinion: John J. and Marianne E. Alf, Hayward V. and Sandra G. Burton, George W. and Betty L. Crawford, Frank J., Jr. and Joyce E. Drayton, Thomas A. and Linda E. McAllister, and Lester W. and Barbara Washington, docket No. 3881-79; Donald R. and Cecile A. Borgeson, docket No. 9235-79; and Clow Corporation, docket Nos. 22777-81 and 22778-81. ↩
2. Unless otherwise specified, these other employees are referred to as the Adair petitioners. ↩ 3. Neither Baker nor Sempowski are petitioners herein.↩
4. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
5. We note that notwithstanding the investment letter, the Adair petitioners had all their stock redeemed in October 1973 rather than just a sufficient number of shares to pay their income tax, thus discounting any investment motive. ↩
6. The definition of fair market value as found in the Estate Tax regulations is equally applicable to the income tax area. See Robinson v. Commissioner,T.C. Memo. 1985-275↩. 7. See Phipps v. Commissioner,43 B.T.A. 1010 (1941), affd. 127 F.2d 214↩ (10th Cir. 1942), in which separate gifts of stock in a single corporation were valued separately in the absence of any regulation similar to sec. 25.2512-2(e), Gift Tax Regs. 8. If the other conditions of Rule 144, S.E.C., are met, a nonaffiliate of the issuer, such as the Adair petitioners, may, for each 6-month period "dribble out" the greater of 1 percent of the number of the issuer's shares outstanding or the average weekly volume of shares traded on an established market or other transaction reporting system. 17 C.F.R. 230.144(e) (1986)↩. 9. Contrary to the Adair petitioners' expert's statement in his report, conversion is not mandatory in order to "dribble out" stock under Rule 144, S.E.C. However, we think that he may have had in mind the practical rather than the legal necessity of conversion in order to sell the stock under the Rule. The stock would have had to be converted, since there was absolutely no market for the Series A preferred; the shares had been issued solely to effect the Clow/Vulcan merger and all of the shares of such stock were in the hands of either Borgeson or the Adair petitioners. ↩
10. Conversion value is the market price of the stock multiplied by the conversion factor, which in the case of the Series A preferred is four. Bard and Moore (respondent's and the Borgeson's experts, respectively) took into account only the bid and asked prices and they appeared on March 2, while Roosma (Clow's expert) alone provided quotations for March 30. ↩
11. We agree with the experts that the value of the stock on the two dates was the same. ↩
12. Were we to find either private placement or registration and public sale the more feasible method of disposition, it would be inappropriate for us to value the stock based on its conversion value; conversion is not necessary under either method. All three experts determined the fair market value of the Series A preferred by assigning a hypothetical investment grade to the stock (determined by comparison with other securities) and using the resultant yield as a capitalization rate for the $ 6 per year earnings. A premium for convertibility was added and the value then discounted for the restricted nature of the stock. To illustrate the results of using such method, and assuming the Series A preferred was of medium investment grade yielding 7.15 percent, the stock's preadjustment value as an investment would be $ 83.92. Adding a 5 percent premium for the convertibility feature increases the value to $ 88.12. However, based on the evidence presented to us by the parties' experts and the findings of the Securities and Exchange Commission in its Institutional Investor Study Report, H. Doc. 92-64, Vol. 5, 92d Cong., 1st Sess. (1971), a discount of 35 percent would be appropriate to take into account the restricted nature of the stock. Under this hypothetical, the fair market value of the stock would be $ 57.28. ↩
13. In following the reasoning of Campbell, we also agree with the Court of Claims' statement that there might "be circumstances relating either to the state of the market or to the securities to be valued that would compel rejection of the market prices as a reliable indicator of value." Campbell v. United States,661 F.2d 209, 221 (Ct. Cl. 1981). By way of example, and while not relevant to our valuation, we note that Clow common stock declined to a mean price of $ 7.75 in December 1973, a price which may be inappropriate to use as a base for valuation of the Series A preferred, so long as Clow was able to pay dividends on its preferred stock. See n. 12, supra; Koffler v. Commissioner,T.C. Memo. 1978-160, 37 T.C.M. 697, 704, 47 P-H Memo. par. 78,159 at 78-697, where we valued preferred stock by reference to its investment value and capitalized earnings. Koffler↩ is to be distinguished since it involved preferred stock that was not publicly traded and not convertible into common stock. 14. On March 2, 1973, the bid and asked prices were 15-7/8 and 16-3/8, respectively, for a mean price of 16-1/8 and a conversion value of $ 64.50. ↩
15. See n. 8, supra.↩ On March 2, 1973, Clow had outstanding 2,914,700 shares of common stock. The highest weekly volume found by any of the experts was less than .5 percent of Clow's outstanding shares. 16. Borgeson's 15,389 shares of Series A preferred were convertible into 61,556 shares of Clow common stock. Under Rule 144, S.E.C.; he could have disposed of 29,147 of these shares in the first 6 months ending September 2, 1973, 29,147 shares in the 6 months ending March 2, 1974, and 3,262 shares any time thereafter. ↩
17. Brownell v. Commissioner,T.C. Memo. 1982-632↩. 18. Girard Trust v. Commissioner,↩ a Memorandum Opinion of this Court dated July 27, 1937. 19. Estate of Sullivan v. Commissioner,T.C. Memo. 1983-185↩ (14.6 percent of outstanding stock). 20. Estate of Kopperman v. Commissioner,T.C. Memo. 1978-475↩. 21. Six months is a reasonable time over which to require Borgeson to dispose of his stock so as to minimize the depressing effect on the market. See sec. 20.2031-2(e), Estate Tax Regs.; Larson v. Commissioner,3 T.C.M. 481↩, 485, 13 P-H Memo T.C. par. 44,169 at 44-540 (1944).