SOL KOFFLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent LILLIAN KOFFLER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Koffler v. Commissioner
Docket Nos. 4875-75, 4876-75.
United States Tax Court
T.C. Memo 1978-159; 1978 Tax Ct. Memo LEXIS 354; 37 T.C.M. (CCH) 697; T.C.M. (RIA) 780159; April 25, 1978, Filed; As Amended May 11, 1978 Lester H. Salter,James R. McGowan, and Justin S. Holden, for the petitioners. Barry J. Laterman, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal gift taxes: Docket No. 4875-75--Sol Koffler Calendar Quarter Ended
Deficiency
June 30, 1971
$581,363.11
Dec. 31, 1971
6,720.00
Docket No. 4876-75--Lillian Koffler
June 30, 1971
$579,812.41
Dec. 31, 1971
6,720.00
Concessions having been made by the parties on separate issues, the issues remaining for decision are: 1. The per share fair market value of the American Luggage Works, Inc., common stock gifted by petitioners *355 on June 29, 1971; and 2. The per share fair market value of the American Luggage Works, Inc., preferred stock gifted by petitioners on June 30, 1971. FINDINGS OF FACT Petitioners Sol Koffler and Lillian Koffler, husband and wife, were legal residents of Providence, Rhode Island, when they filed their petitions. On June 29, 1971, Sol Koffler (hereinafter Sol) gratuitously transferred 2,500 shares of American Luggage Works, Inc.'s (ALW), common stock to trustees of the irrevocable Paula A. Granoff Trust. On June 30, 1971, Sol gratuitously transferred 2,500 shares of ALW's 5-percent cumulative preferred stock to trustees of the irrevocable Koffler Charitable Interest Trust. On December 21, 1971, Sol gifted 40 shares of ALW's common stock to his children, grandchildren, and son-in-law, Leonard Granoff (Granoff). [1]
Petitioners filed separate Federal gift tax returns for the calendar quarters ended June 30, 1971, and December 31, 1971, with the North Atlantic Service Center, Andover, Massachusetts. *356 Lillian Koffler reported half of Sol's gifts as her own. Both the common stock and preferred stock were reported on the Federal gift tax returns for the calendar quarter ended June 30, 1971, as having a fair market value of $859.92 per share. The common stock gifted on December 21, 1971, was reported as having a fair market value of $1,200 per share. ALW was incorporated in Rhode Island in 1946.In June 1971, it was engaged primarily in the production and sale of molded hardside luggage. ALW's manufacturing process was essentially one of assembling component parts, such as shells, hardware, and a variety of fabrics, purchased from independent suppliers. The company's main production facility, which was leased from the Koffler family, was a turn-of-the-century three-story brick mill building located in Warren, Rhode Island. ALW sold its hardside luggage under the trade name "American Tourister." In addition, during 1971, it sold some tote bags and a small amount of imported softside luggage. Through its own salesmen, ALW sold directly to retailers. No single customer accounted for as much as 10 percent of sales, and no customer was bound by long term purchase contracts. ALW *357 introduced its molded hardside luggage in 1954 and thereafter had made only cosmetic changes in it.
Sol was ALW's founder and served as its president from its incorporation through 1971. He was responsible for overall supervision of the company's operations, and for product design. In 1971, he was 64 years of age. In addition to Sol, ALW's 1971 management group included Granoff, who was executive vice president. In 1971, Granoff was 44 years old and had been with the company since 1954. H. Russell Anderson was vice president in charge of sales but was not responsible for general management of the company. He began his employment with ALW in 1962. ALW did not contemplate any change in management. As of June 8, 1971, ALW had one class of common stock with 15,000 shares issued and outstanding. This stock was owned by various members of the Koffler family as follows: Number of Shares
Sol Koffler
9,654
Lillian Koffler
3,087
Leonard Granoff
157
Daughters
1,317
Grandchildren
785
ALW's stock had never been publicly traded and it had not been registered for sale with the Securities and Exchange Commission or under the laws of Rhode *358 Island. Cash dividends were last paid on the stock in 1951, and no dividends on the common stock were contemplated. On or about June 8, 1971, ALW's directors and shareholders amended the company's articles of incorporation to authorize the issuance of 15,000 shares of new $1,000-par-value 5-percent cumulative preferred stock. This stock was redeemable at any time at $1,000 a share plus accrued dividends.In addition, it was entitled to a liquidation preference of $1,000 per share plus accrued dividends, and each share carried the same voting rights as a share of common stock.Pursuant to the company's offer to exchange this preferred stock on a share-for-share basis for the outstanding common stock, Sol exchanged 5,000 shares and Lillian Koffler 1,250 shares of their common stock. After these exchanges there were 8,750 shares of common stock and 6,250 shares of preferred stock outstanding. ALW maintains its accounts on an accrual basis, using a fiscal year ending June 30. The following is a summary of ALW's unaudited balance sheets for the fiscal years June 30, 1966, through June 30, 1970: ASSETS
( $000's)
6/30/66
6/30/67
6/30/68
6/30/69
6/30/70
Cash
$3,210
$2,727
$ 3,446
$ 4,287
$ 4,393
Other current
assets
4,572
5,601
6,470
7,390
7,017
Net fixed assets
264
295
293
573
653
Other assets
483
572
960
1,243
2,260
Total assets
$8,529
$9,195
$11,169
$13,493
$14,323
LIABILITIES, CAPITAL, AND SURPLUS
( $000's)
Current liabilities
$2,313
$1,710
$ 2,304
$ 2,622
$ 1,424
Capital - common
stock, 20,000 no
par value shares
authorized,
15,000 issued
3,500
5,000
6,500
8,000
10,000
Earned surplus
2,716
2,485
2,365
2,871
2,899
Total liabilities,
capital, and
surplus
$8,529
$9,195
$11,169
$13,493
$14,323
BOOK VALUE PER SHARE
$ 414.41
$ 499.03
$ 590.99
$ 724.73
$ 859.92
*359 A summary of ALW's unaudited income statements for the period July 1, 1965, through June 30, 1970, is as follows: INCOME STATEMENT
( $000's)
Fiscal
Fiscal
Fiscal
Fiscal
Fiscal
Year
Year
Year
Year
Year
1966
1967
1968
1969
1970
Net sales
$18,594
$18,609
$21,530
$24,434
$24,419
Cost of goods
sold
11,677
11,713
14,016
14,525
14,091
Gross profit
on sales
$ 6,917
$ 6,896
$ 7,514
$ 9,909
$10,328
Net income
$ 1,566
$ 1,259
$ 1,379
$ 2,072
$ 2,028
EARNINGS PER SHARE
$ 104.43
$ 83.93
$ 91.96
$ 138.14
$ 135.19
ALW's accountants compiled monthly trial balances in addition to preparing yearly financial statements. The May 31, 1971, trial balance reflected that ALW had cash of $7,248,695.47 and net sales of $22,660,806.80. The estimated earnings and book value per share for the company's common stock was $200.35 and $960.22, respectively. Since the annual physical inventory was not taken by ALW's employees until after the end of the fiscal year, the June 30, 1971, balance sheet and income statement were not completed until early September 1971. ALW did not keep a perpetual *360 inventory. During the years prior to 1971, the number of American luggage manufacturers declined. In addition, the remaining companies found themselves in a stagnant industry. Although the travel industry grew from 1969 to 1971, the number of pieces of luggage sold and the total sales volume declined. American luggage manufacturers had to compete with less expensive imported softside luggage which was taking an increasingly larger share of the market. During 1971, Samsonite Corporation (Samsonite) was America's largest luggage manufacturer.It also was the only publicly-owned corporation in the industry. The average of the bid and ask closing prices in June 1970, for its common stock was $13.81. As of December 31, 1970, and June 30, 1971, Samsonite had 5,009,315 shares of common stock and 5,000 shares of cumulative preferred stock outstanding. Samsonite's net sales and net income attributable to sales for the taxable years 1966 through 1970 were as follows: Net Sales
Net Income Year
( $000)
( $000)
1966
$74,410
$4,046
1967
82,574
4,275
1968
89,709
4,234
1969
95,632
2,942
1970
92,897
3,468
In 1970 Samsonite had an *361 additional item of nonrecurring net income in the amount of $696,000 which was attributable to gain realized on the sale of a manufacturing facility.
Samsonite's balance sheets as of December 31, 1966, through December 31, 1970, are as follows: ASSETS
( $000's)
12/31/66
12/31/67
12/31/68
12/31/69
12/31/70
Current assets
$33,101
$39,355
$43,790
$50,269
$41,657
Net fixed assets
13,922
19,557
25,995
28,542
26,959
Other assets
1,076
1,007
319
526
2,536
Total assets
$48,099
$59,919
$70,104
$79,337
$71,152
LIABILITIES AND NET WORTH
( $000's)
Current liabilities
$ 8,188
$11,655
$18,499
$25,181
$13,176
Deferred Federal
income tax
0
115
323
711
1,313
Long term debt
5,000
10,000
10,434
10,602
11,063
Total liabilities
$13,188
$21,770
$29,256
$36,494
$25,552
Preferred stock
$ 500
$ 500
$ 500
$ 500
$ 500
Common stock
500
500
500
640
650
Earned surplus
33,912
37,147
39,848
41,703
44,450
Total net $34worth,912
$38,147
$40,848
$42,843
$45,600
DIVIDENDS
Preferred $0
$ 40
$ 40
$ 40
$ 40
Common $0
$ 1,000
$ 1,125
$ 1,126
$ 1,377
Unlike *362 ALW, Samsonite manufactured the component parts for its hardside luggage. It also had modern manufacturing facilities in the United States, Canada, and Belgium. Its new American plant had been completed in 1970. In addition Samsonite was a diversified company engaged in the manufacture and sale of furniture, toys, and small computers. An average of approximately 19 percent of its net sales for 1967 through 1970 were attributable to furniture sales. During these years, sales of toys and small computers averaged approximately 6 percent. Foreign operations accounted for approximately 11.2 percent of total net sales in 1969 and 11.9 percent in 1970. In the deficiency notices, respondent determined that the common stock gifted by petitioners on June 29, 1971, and December 21, 1971, and the preferred stock gifted on June 30, 1971, had fair market values of $2,000 per share and $859.92 per share, respectively. ULTIMATE FINDINGS OF FACT ALW's common stock gifted by petitioners on June 29, 1971, had a per share fair market value of $1,250 on that date. ALW's preferred stock gifted by petitioners on June 30, 1971, had a per share fair market value of $500 on that date. OPINION
*363 General
Section 2512(a), [2]/ Internal Revenue Code of 1954, provides that if a gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. In the valuation of stock not publicly traded, such as ALW's common and preferred, section 25.2512-2(f)(2), Gift Tax Regs., states that the following factors should be taken into consideration: (2) * * * the company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors. Some of the "other relevant factors" referred to in * * * [subparagraph] (2) of this paragraph are: The goodwill of the business; the economic outlook in the particular industry; the company's position in the industry and its management; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * * [3]
*364 These factors cannot be applied with mathematical precision. Rather, the unique facts of each case must be weighed and considered. See Messing v. Commissioner,48 T.C. 502, 512 (1967). The following table shows the several opinions that have been expressed on the value of the gifted ALW stock on the valuation dates: Common
Preferred
Gift tax return
$ 859.92
$ 859.92
Notice of deficiency
2,000.00
859.92
Petitioner's expert witness,
Elgin Groseclose
150.00
500.00
Petitioner's expert witness,
Ronald F. Wippern
867.00
397.50
Respondent's expert witness,
Allyn Joyce
2,325.00
700.00
Groseclose's Analysis
Elgin Groseclose's (Groseclose) value estimates were a reflection of his stark pessimism concerning the future of the United States luggage industry in general and petitioner's business in particular. He took the view that the luggage business "was not a growing business and what in business is not growing is dying." It was his opinion that travelers need less luggage than they did in the past because of the widespread use of easily-laundered clothing; that ALW's heavy hardside luggage was outdated; and *365 that imported light, soft luggage was capturing the available market. ALW's manufacturing facilities were obsolete; it had no plans for diversification; its sales force was small; it was dominated by the Koffler family; and its management was efficient but thin. During the relevant period, investors were demanding vehicles with characteristics of growth, liquidity, and return. ALW had no growth potential, but rather was facing a diminishing market for its product. ALW had not paid a dividend since 1951, and the minority interest being valued could not compel it to do so. The stock was not publicly traded and had no market as such. Groseclose concluded that a purchaser of the blocks of stock to be valued could not market them readily because they were minority interests and ALW was so completely controlled by the Koffler family. It was his view that ALW will likely be liquidated at Koffler's death (life expectancy 13.6 years from 1971) or almost certainly at Granoff's death (life expectancy 27.5 years from 1971). While ALW had several profitable years immediately prior to the valuation dates, Groseclose did not think this trend would continue. It was his view that: "The *366 most that the evidence would sustain was that the reserves would not be different from what they were at valuation date;" i.e., a book value of $1,061 per share and liquid assets of $709 per share. Based on this analysis and applying a discount for the delay in realizing the liquidation proceeds, he arrived at a value of $500 per share for the preferred shares and $150 per share for the common stock. Wippern's Analysis
Petitioner's other witness, Ronald F. Wippern (Wippern), Analyzed ALW's operations and financial performance, making a comparison with ALW's principal competitor, Samsonite, whose stock was traded over the counter. It was his view that ALW's basic business risk was significantly greater than that of Samsonite because (1) ALW's sole product was luggage whereas Samsonite was well diversified; (2) ALW's sole market in 1971 was in the United States whereas Samsonite had subsidiaries in Belgium, Canada, France, Germany, and Mexico; (3) ALW's manufacturing operation was an assembly process whereas Samsonite was fully integrated; (4) ALW's production plant was located in old buildings designed to house a textile mill whereas Samsonite's plants were modern, well-equipped, *367 and designed for luggage production; (5) ALW's top management staff was limited to Koffler, 64 years old in 1971, and his son-in-law, Granoff, 44 years of age at that time, whereas Samsonite was well staffed. Wippern also concluded that the financial risk affecting ALW's stock was greater than the financial risk imposed on Samsonite's shareholders. ALW's ratio of debt and preferred stock to total capital was 43 percent as of June 30, 1970, compared with Samsonite's ratio of 20.8 percent as of December 31, 1970. During its fiscal year ended June 30, 1970, ALW's total after-tax earnings declined 2.1 percent whereas Samsonite's after-tax earnings during the calendar year ended December 31, 1970, increased by 44 percent. ALW was paying no dividends on its common stock and had no plans to do so, whereas Samsonite was paying out about 27 percent of its earnings as dividends. Samsonite's sales were 3.8 times larger than ALW's sales. Based on 1970 earnings per share, including extraordinary items, Samsonite's stock was selling at a price in the range of a price-earnings ratio of 16.8 to 17.1. Wippern took the view that, on a comparative basis, ALW's stock would have sold at a price-earnings *368 ratio of 7.6 (or $1,523 per share) had it been publicly traded. He discounts the stock by 1/3 for its lack of marketability and minority interest factors and arrives at a value of $1,016 per share based on the price-earnings ratio approach. Wippern next analyzed the ALW stock by use of the price-cash flow method. The concept underlying this method is that cash flow (profits after taxes plus noncash expenses such as depreciation) represents a better measure of cash-generating ability of the firm than do earnings. And it is cash that is used for new equipment, payment of dividends, plant maintenance, and the like. The cash flow of Samsonite for the year ended December 31, 1970, was $3.67 per share and the estimated cash flow of ALW for the year ended June 30, 1971, was $212.15 per share. Using the same ratio for price to cash flow as was used under the price-earnings method, Wippern arrives at a gross value of $806.17 per share for the ALW stock and then discounts it by 1/3 for the absence of marketability and minority interest factors, arriving at a value of $538 per share under the pricecash flow method. Finally, Wippern analyzed Samsonite's stock by comparing the market value *369 of its publicly-traded stock with the book value of those shares. He found that the Samsonite stock's average price during the 6 months ended June 30, 1971, was $14 per share and its book value as of December 31, 1970, was $9. ALW's stock had a book value of $960.22 per share, and applying the Samsonite ratio would give it a gross value of $1,469 to $1,498 per share. Applying the 1/3 discount for the lack of marketability and minority interest factors gives a value of $980 to $999 per share for the stock. Using this approach, he arrived at a value of $990 per share. Wippern regards the price-earnings ratio method as the most appropriate method but expressed the view that the other two methods were entitled to some weight. He uses the weighted values of 2.5, 1.5, and 1, respectively, for the price-earnings, price-cash flow, and market-to-book value approaches. In this manner he arrived at a fair market value of $867 for the common stock. As to the preferred stock, Wippern pointed out that it shares fully in voting rights with the common stock, and that it is callable, without premium, on 30 days' notice. He re-emphasized the investment risks, discussed above, and concluded *370 that investors would demand a premium above the return normally obtainable on speculative grade industrial preferred stock. After adjusting for this premium and the absence of marketability, he concludes the preferred stock had a value of $397.50 per share. Joyce's Analysis
Respondent's witness, Allyn Joyce (Joyce), compared ALW with Samsonite and with a selected group of secondary comparative companies, all of which were publicly traded and were deemed to have investment characteristics and growth patterns similar to those of ALW. In making these comparisons and in arriving at values of the ALW stock he used the "total invested capital" technique. This technique is concerned with the relationship of the total market value of all long term debt, preferred stocks, and common stocks to: (1) the book value of the total invested capital (i.e., all the capital invested in the company on a long term basis); (2) the total adjusted earnings (i.e., net income as reported, adjusted for extraordinary items, plus the interest paid on the long term debt); and (3) the total earnings paid out (i.e., interest paid on the long term debt and dividends). This approach was designed to compensate *371 for the differences between the forms of the capitalization of ALW and the selected comparatives. Joyce first adjusted ALW's invested capital for cash of $4,236,000 in excess of what he considered necessary for operating purposes. After making this adjustment, he arrived at a preliminary indicated value for ALW of $30,664,000 by deriving the ratio between the market value on June 30, 1971 of Samsonite's total invested capital and its (1) total adjusted earnings, (2) adjusted total invested capital, and (3) total earnings paid out and applying these ratios to ALW. Joyce used a similar technique in making an analysis of six secondary comparative corporations and arrived at a total ALW value of $27,158,000. Joyce emphasized that the prices used for all the comparative companies were prices paid for minority interests which could not control dividend policy. Joyce expressed the view that ALW was superior to Samsonite in every respect except "depth of management." Thus, according to his analysis, ALW was superior to Samsonite in terms of (1) volume of sales relative to its capital, (2) profit margins, and (3) rate of earnings on capital. He gave little weight to ALW's decline in *372 earnings in 1967 and 1970, Samsonite's diversification and ALW's lack thereof, and the risk of increasing imports of soft luggage.
Joyce added to his computed values $3,000,000 for the excess cash of $4,236,000 disregarded in his computations.Based on total assets, current assets, and earning coverage and yield, he thus arrived at a value of $714 for the preferred stock if it were publicly traded and then added $98 for its voting privileges. This value for the preferred stock left a value of $2,743 for the common. Joyce then discounted the common by 15 percent and the preferred by 12 percent for lack of marketability, arriving at a rounded-off figure of $2,325 per share for the common and $700 per share for the preferred stock. Valuation of the Common Stock
While we do not think the investment world would share Groseclose's dark pessimism about ALW's future, we think Joyce's approach was entirely too theoretical. We think Wippern's estimates were more reasonable, but, as we view the evidence, they need adjustment. In particular, we think he gave too much weight to the 1970 drop in earnings and too little weight to the overall trend in earnings prior to that year. As *373 we view the evidence, one of the most important considerations in valuing the ALW stock is that the stock was not publicly traded and there was no market for it. The block to be valued is a minority interest in a corporation dominated by the Koffler family, and the company's policies were subject to the whims of that family. The stock had not paid a dividend since 1951, and there was no prospect that the company's dividend policy on the common stock would change. A purchaser of the stock, as a practical matter, could expect to dispose of it only through a private sale, and no steps had been taken to have the stock registered with the Securities and Exchange Commission. We think Joyce's argument that the over-the-counter price of the stocks of Samsonite and the other companies selected as secondary comparatives reflected the appropriate discount for a minority interest like that of the subject ALW stock is specious. Almost any available block of publicly-traded stock sold in day-to-day transactions, whether over the counter or on one of the exchanges, is a minority interest which could not determine dividend or other company policy. But the important consideration is that there *374 is a day-to-day market for such stock, and in the absence of some unusual circumstance a purchaser can convert his investment to cash at any time. He would have no such assurance with respect to the minority block of ALW stock. ALW had substantial cash on hand which could have been used for dividends, but the minority blocks in question could have little influence on dividend policy. We are convinced that a potential purchaser would have great concern about this factor. As we view the evidence, moreover, ALW had reached a critical point in its history. Subject to the decrease in earnings in its fiscal year u970, ALW's earnings per share had increased since 1967. But its earnings were dependent almost entirely on a single product, its "American Tourister" hardside luggage. Although domestic travel was increasing, total domestic luggage sales were falling, and imported luggage sales were increasing. ALW's manufacturing facilities, located in old mill buildings, were not easily adaptable to the manufacture of other products. ALW's top management was limited to Koffler and Granoff, and ALW had gained no foothold in the foreign market. ALW's growth prospects were not good. *375 Taking these and other factors and the opinions of the experts into account, we find that the ALW common stock had a value of $1,250 per share on the critical date. [4]
Valuation of the Preferred Stock
Since ALW's $1,000-par-value 5-percent cumulative preferred stock had a fixed annual yield, valuation of it is not as difficult as valuing the company's common stock. The best valuation method for the preferred stock, as we view the record, is *376 to capitalize the $50 annual dividend thereon at a market rate equal to the rate of return from similar grade marketable securities and then make appropriate adjustments for variations from the norm for certain characteristics of the ALW stock. In addition, it will be necessary to make an adjustment for lack of marketability. Because of the business risk caused by the problems facing the domestic luggage industry and their effect on ALW's future earnings and growth, investors in the company's preferred stock would demand a high rate of return. The average yield to maturity in June 1971 for medium-grade industrials was 7.31 percent and for speculative-grade industrials was 7.85 percent. Because of the added unusual feature that the preferred stock was callable upon 30 days' notice, without any requirement on the corporation to pay a call premium, we think investors would have demanded at least a 7.85-percent rate of return from it. Although the preferred stock shared in voting rights with the common stock, a purchaser would have been a minority shareholder in the family-controlled corporation, and it is unlikely that he would have paid a premium for this unusual voting right. *377 After application of an appropriate discount for nonmarketability, we find that the per share fair market value of the preferred stock on June 30, 1971, was $500. To reflect the above and concessions made by the parties, Decisions will be entered under Rule 155.
Footnotes
1. /↩ The parties agree that the stock's per share fair market value on Dec. 21, 1971, shall be considered the same as the Court's determination of its June 29, 1971, value.
2. SEC. 2512. VALUATION OF GIFTS. (a) If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. ↩
3. Rev. Rul. 59-60, 1959-1 C.B. 237, 238, lists other factors to be considered in valuation of such stock as follows: (a) The nature of the business and the history of the enterprise from its inception. (b) The economic outlook in general and the condition and outlook of the specific industry in particular. (c) The book value of the stock and the financial condition of the business. (d) The earning capacity of the company. (e) The dividend-paying capacity. (f) Whether or not the enterprise has goodwill or other intangible value. (g) Sales of the stock and the size of the block of stock to be valued.
(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.↩
4. We do not base this finding on any precise formula. Taking Samsonite as the most nearly comparable company, however, we note that it had a price-earnings ratio of 20.3 (based on normalized income) in its calendar year 1970.Using Samsonite as a comparative, we think substantial discounts would be required in arriving at a price-earnings ratio for ALW: at least 15 percent for ALW's thin management; at least 30 percent for ALW's lack of diversification, its outmoded manufacturing facilities, its limit to the domestic market, its failure to pay any dividends since 1951, and its domination by a single family; and an equal discount for the fact that the ALW stock was not publicly traded and could not be easily marketed.↩