CARR STALEY, INC., Plaintiff-
Appellant,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 73-3198.

United States Court of Appeals,
Fifth Circuit.

July 5, 1974.

Rehearing and Rehearing En Banc
Denied Oct. 3, 1974.

Harold D. Rogers, Wichita Falls, Tex., for plaintiff-appellant.

L. Dan Jones, Washington, D. C., amicus curiae, for Independent Petroleum Assoc. of Am.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, Jonathan S. Cohen, Attys., Dept. of Justice, Tax Div., Washington, D. C., Eugene Sayre, Dept. of Justice, Tax Div., Dallas, Tex., Frank D. McCown, U. S. Atty., William L. Johnson, Jr., Asst. U. S. Atty., Ft. Worth, Tex., William S. Estabrook, III, Atty., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before GEWIN, THORNBERRY and SIMPSON, Circuit Judges.

GEWIN, Circuit Judge:

Carr Staley, Inc., the taxpayer, appeals from the district court's judgment denying its claim for a refund of income taxes which it alleges were unconstitutionally imposed pursuant to 26 U.S.C.A. § 636(b) (Supp.1974). It was taxpayer's position below, as here, that § 636(b) is unconstitutional because it results in the taking of taxpayer's property without due process of law in contravention of the fifth amendment. After a careful review of the provisions of § 636(b) and the Congressional purpose underlying its enactment, we concur with the district court's conclusion that the contested provision is a proper exercise of Congress's authority to "lay and collect taxes on incomes, from whatever source derived."[1]

[1]. U. S. Constitutional Amendment XVI.

I

A production payment may be defined

". . . a right to a specified share or production from a mineral property (or a sum of money in place of production) when that production occurs. The production payment is secured by an interest in the minerals, the right to the production is for a period of time shorter than the expected life of the property, and the production payment usually bears interest." See Joseph, Recent Developments in Oil and Gas Taxation, 22 Oil & Gas Tax Q. 164, 172 (1974).

The retained production payment is a frequently used method for splitting property interests of minerals in place. Before the enactment of the Tax Reform Act of 1969, it was an effective technique for dividing the income which resulted from the extraction of oil or other minerals. Under common practice, the owner of an oil holding will convey his interest to another party for a sum certain. Conjointly he will retain the right to a production payment which entitles the assignor to future income from the oil produced. This payment will be paid out from the oil as it is extracted. The assignor looks to the oil in place as the source for the payment of his reserved interest. We have previously noted that:

"A fundamental characteristic of a production payment is that it is not burdened with any of the operating expenses of a lease. It is payable only out of production, and there is no personal liability on the part of the owner of the production payment. The production payment owner has no possessory interest, no right to drill, no right to the surface, and no claim to possession. . . . His interest is an incorporeal hereditament in the nature of an overriding royalty creating a present interest in land in the payee." Brooks v. Commissioner, 424 F.2d 116, 122 (5th Cir. 1970).

Thus the assignee of mineral lands encumbered by a production payment assumes no personal liability for the payment of the retained production payment. The assignor is completely relegated to and dependent upon the oil in place as the generator of funds for retiring the payment.

■■ On January 1, 1972, Alfred B. Guinn conveyed to the taxpayer an undivided ¹⁄₁₆th working interest in an oil and gas lease which Guinn owned. The record reveals that under the terms of this assignment, Guinn immediately received from taxpayer $2000. As addi- tional consideration for the transfer, Guinn retained a production payment in the undivided ¹⁄₁₆th working interest. This retained production payment was made payable out of 70% of all oil or other minerals produced from the ¹⁄₁₆th working interest until Guinn had received an additional $5,000. Further, the agreement provided that Guinn was to receive an amount of interest[2] equal to the rate of 10% per annum on the unliquidated balance owing under the retained production payment plus an amount equal to all the ad valorem taxes assessed against the property represented by the production payments.[3]

2. The taxpayer hotly contests finding of fact No. 2 by the district court which is as follows:

"In January of 1972, plaintiff bought an undivided ¹⁄₁₆th working interest in an oil and gas lease known as the Petrix D Lease. The consideration for this purchase was $7,000, plaintiff paying $2,000 in cash and the seller reserving a $5,000 production payment, bearing interest at the rate of 10 percent per annum, payable out of 70 percent of the minerals produced and attributable to the ¹⁄₁₆th working interest."

Taxpayer claims that there is *no evidence* in the record to establish the fact that $2,000 was initially paid and the additional $5,000 was payable as production progressed. We disagree. Neither the district court nor this court is bound to accept the particular label which a taxpayer attaches to various documentary and oral evidence. The check for $2,000 paid at the time of the transfer does contain the words "purchase of lease." It is dated the same day the assignment was made. It is obvious that the consideration described in the assignment as "Ten dollars ($10.00) and other good and valuable considerations" refers to the $2,000 payment. The lease then proceeds to set forth the terms as to the $5,000 payment. Moreover, on cross-examination one of the witnesses for the taxpayer was interrogated about the two payments mentioned and the agreement to pay "ten percent interest." He made a general answer that, "Well it is a price offered and a price accepted for a particular interest." We find ample support in the record for the quoted finding of the district court.

3. The full text of the actual assignment by Guinn to Carr Staley, Inc. is as follows:

ALFRED B. GUINN
CARR STALEY, INC.
ASSIGNMENT OF OIL AND GAS LEASE WITH RESERVATION OF PRODUCTION PAYMENT
THE STATE OF TEXAS ⎫
COUNTY OF ARCHER ⎭
WHEREAS, the following facts presently exist:
1. Alfred B. Guinn of Wichita Falls, Texas (called "GUINN"), is the owner of an undivided one-sixteenth (¹⁄₁₆) working interest in and to the oil and gas lease described in Exhibit "A" attached hereto and made a part hereof for all purposes (called "LEASEHOLD ESTATE").
2. Carr Staley Inc. (called "STALEY"), a Texas corporation, has its offices at 810 City National Building, Wichita Falls, Texas.
3. Guinn desires to sell to Staley an undivided one-sixteenth (¹⁄₁₆) of the entire working interest in the above described lease reserving unto himself a production payment.
NOW, THEREFORE, KNOW ALL MEN BY THESE PRESENTS:
That Guinn, for and in consideration of TEN DOLLARS ($10.00) and other good and valuable consideration, the receipt of which is hereby acknowledged, and subject to the conditions and reservations hereinafter set forth, does hereby SELL, ASSIGN, TRANSFER and SET OVER unto Staley an undivided one-sixteenth (¹⁄₁₆) interest in the Leasehold Estate, subject, however, to the present overriding royalty interest, restrictions, exceptions and limitations of the original lease and all assignments thereof and subject to the following reservation:
Guinn excepts and reserves unto himself as a Production Payment seventy percent

In this particular oil venture, the Medders Petroleum Corporation actually conducted the operation and extracted the oil from the leased premises and the Atlantic Richfield Company purchased the oil as it was removed from the ground. Atlantic Richfield paid Guinn and Carr Staley directly for the oil produced from the leased premises an amount which corresponded to Guinn's retained production payment and Carr Staley's right to production under the assignment. During the time period in question, January 1, 1972 to July 31, 1972, Atlantic Richfield paid the taxpayer $549.90 for its proportional interest in the leased premises. Additionally, taxpayer was charged $407.76 by Medders Petroleum for the operating expenses incurred in extracting the oil from its $\frac{1}{16}$th working interest. More important to the problem here posed, Guinn received $1,283.09, which amount equaled his retained production payment in the $\frac{1}{16}$th working interest. Under the proscriptions of § 636(b) the taxpayer

was compelled to include in its gross income the money paid to Guinn.

Several Supreme Court opinions have given favorable treatment to oil property apportioned in this manner. These cases invariably arose because both the assignor and assignee of oil property were seeking the oil depletion allowance on the same interest represented by the retained production payment. The Court held that where the assignor had retained such rights which amounted to "an economic interest in the oil in place," then he rather than the assignee was entitled to the depletion allowance. See Thomas v. Perkins, 301 U.S. 655, 57 S.Ct. 911, 81 L.Ed. 1324 (1937); Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277 (1940); Commissioner v. Southwest Exploration Co., 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347 (1956).

Relying on the property theories advanced by these cases and the unique features of the retained production payment, taxpayer asserts that it is being

(70%) of all the oil, gas and other minerals in and under and that may be produced, saved and sold and attributable to the Leasehold Estate including any renewals or extensions of the lease included under the Leasehold Estate, until there shall have been received free and clear from all expenses of operation, development and maintenance (except gross production and severance taxes), the full net sum of FIVE THOUSAND AND NO/100 DOLLARS ($5,000.00) ("PRIMARY SUM") plus an amount equivalent to interest at the rate of ten percent (10%) per annum on the diminishing unliquidated balance of the Primary Sum from the date this conveyance is executed until such Primary Sum be fully liquidated plus an additional amount equal to all ad valorem taxes assessed against the Production Payment both of which amounts are hereinafter called "ADDITIONAL SUM".

Guinn also BARGAINS, SELLS and TRANSFERS to Staley an undivided one-sixteenth ($\frac{1}{16}$) interest in and to the personal properties and equipment situated on or used or obtained in connection with the Leasehold Estate, including a like interest in the productive wells situated thereon.

If, as and when Guinn, his heirs or assigns, shall have so received the aforesaid

Primary Sum together with the Additional Sum thereon from the said reserved Production Payment, then the said interest shall automatically terminate and thereafter that part of the working interest under the lease from which the same is hereby reserved shall be wholly free and clear of Guinn's reserved Production Payment.

TO HAVE AND TO HOLD the above described Leasehold Estate in and to the aforesaid property and premises, together with all and singular the rights and appurtenances thereto in anywise belonging, unto Staley, its successors and assigns, forever, and Guinn hereby binds himself, his heirs, executors, representatives and assigns, to warrant and forever defend said interest of Staley against every person whomsoever lawfully claiming, or to claim the same, or any part thereof, by, through and under Guinn only.

This Assignment shall be effective as of 7:00 a. m. on the 1st day of January, 1972.

EXECUTED this 14 day of January, 1972.

(s) Alfred B. Guinn
CARR STALEY, INC.
(s) By Carr Staley, President

taxed for the income of another individual which it asserts is forbidden by the fifth amendment. Taxpayer contends that the income accruing to Guinn as a result of his retained production payment was his alone and any attempt to tax it for that income would be arbitrary and capricious and thus beyond the power of Congress.

Section 636(b) states that:

"A production payment retained on the sale of a mineral property shall be treated, for purposes of this subtitle, as if it were a purchase money mortgage loan and shall not qualify as an economic interest in the mineral property."

By enactment of Section 636(b), Congress has repudiated "the economic interest test" developed by the Supreme Court in determining whether income attributable to a retained production payment shall be taxed to the assignor or the assignee. Under the new standard, the retained production payment is treated as a purchase money mortgage and the income produced from that retained production payment is taxed to the mortgagor (assignee) as in other cases.[4]

The Senate Report issued in support of the new treatment that is given production payments leaves little doubt as to the impetus for the change.[5] The Re-

---

4. Under the new treasury regulations, a production payment is defined as a

"right to a specified share of the production from mineral in place (if, as, and when produced), or the proceeds from such production. Such right must be an economic interest in such mineral in place. It may burden more than one mineral property, and the burdened mineral property need not be an operating mineral interest. Such right must have an expected economic life (at the time of its creation) of shorter duration than the economic life of one or more of the mineral properties burdened thereby. A right to mineral in place which can be required to be satisfied by other than the production of mineral from the burdened mineral property is not an economic interest in mineral in place. A production payment may be limited by a dollar amount, a quantum of mineral, or a period of time. A right to mineral in place has an economic life of shorter duration than the economic life of a mineral property burdened thereby only if such right may not reasonably be expected to extend in substantial amounts over the entire productive life of such mineral property. The term 'production payment' includes payments which are commonly referred to as 'in-oil payments', 'gas payments', or 'mineral payments'." 26 C.F.R. § 1.636–3(a)(1) (1973).

5. Those portions of the Senate Report relevant to the discussion here read in part:

5. *Mineral Production Payments*

*Present law.*—A mineral production payment is a right to a specified share of the production from a mineral property (or a sum of money in place of the production) when that production occurs. The payment is secured by an interest in the min-

erals, the right to the production is for a period of time shorter than the expected life of the property, and the production payment usually bears interest. Depending on how a production payment is created, it may be classified as a carved-out production payment, or retained production payment which may then be used in a so-called A-B-C transaction.

A carved-out production payment is created when the owner of a mineral property sells—or carves out—a portion of his future production. A carved-out production payment is usually sold for cash and, quite often, to a financial institution. Under present law, the amount received by the seller of the carved-out production payment generally is considered ordinary income subject to depletion in the year in which received. The purchaser of the production payment treats the payments received as income subject to the allowance for depletion (almost always cost depletion) and thus generally pays no tax on those amounts (except for that portion of the payments which is in the nature of interest). The amounts utilized to pay the production payment are excluded from income by the owner of the property during the payout period, but the expenses attributable to producing the income are deducted by him in the year they are incurred.

A retained production payment is created when the owner of a mineral interest sells the working interest, but reserves a production payment for himself. Under present law the owner of the retained production payment receives income for which percentage depletion may be taken during the payout period, or period during which he receives a part of the production (or a payment based on production). The purchaser of the working interest excludes

the amounts used to satisfy the production payment during the payout period, but (until recently) deducted the cost of producing the minerals subject to the production payment.

The so-called A-B-C transaction is the same as a retained production payment case, except that after selling the working interest, the initial owner then sells the "retained production payment." Thus, in an A-B-C transaction, the owner of the mineral property, A, sells it to a second person, B, and reserves a production payment (bearing interest) for a major portion of the purchase price. He then sells the production payment to a third party, C, which is usually a financial institution, or, perhaps, a tax-exempt organization.

*General reasons for change.*—The treatment of mineral production payments under present law has resulted in what are essentially two problems, one relating to carved-out production payments and one relating to retained production payments and A-B-C transactions. In the case of the carved-out payments, by advancing the time income (but not the related expense) is reported for tax purposes, taxpayers, have been able to avoid limitations based on net or taxable income—principally the 50-percent limitation on taxable income from the property for percentage depletion purposes, but also the foreign tax credit limitation, the 5-year net operating loss carryover limitation, and the 7-year investment credit carryover. In the case of A-B-C transactions, taxpayers have been able to amortize or pay off what is essentially a loan with before-tax dollars rather than after-tax dollars.

In each of the three situations (the carved-out production payment, the retained production payment, and the A-B-C transaction), the transaction is similar, in fact, to a loan transaction with the loan secured by a mortgage on the property and the "borrower" not personally liable for the loan. In a carve-out, the analogy to a loan is the borrowing of money (selling a production payment). In an A-B-C transaction, the analogy is to the sale of a property but subject to a mortgage subsequently sold to someone else.

The factual similarity between the creation of a production payment and a loan transaction and the disparate tax treatment of production payments and loans can be illustrated by examining two hypothetical A-B-C transactions, one involving an oil payment, and the other the sale of an apartment.

Assume that A sells an operating business to B—the business may be an oil well, or it may be an apartment building. However, assume that A retains the right to a production payment—a payment equivalent to the current price of a specified number of barrels of oil—or in the case of the apartment building, a mortgage, which is not much different from the production payment. Then suppose that A sells the production payment or mortgage to C.

From A's standpoint, the two transactions are treated the same—they both result in a capital gain–or loss–to A depending upon his cost or other basis whether it is the apartment building or oil well which is being sold.

However, the similarity between the oil well and the apartment building ends here. In the case of the apartment building, all of the rental income after ordinary expenses and depreciation is taxable income to B and he must pay off the mortgage out of "after tax" dollars.

In the case of the oil well, however, B is not considered as receiving the production payment at all—which, in the typical case, may well amount to as much as 90 percent of the income from the well. Thus, in this case B is, in effect, paying the production payment out of "before-tax dollars." This privilege of purchasing capital interests out of tax-free income is not a privilege accorded ordinary taxpayers. At the same time (until recently in the *Brooks* case), B, in the case of the oil well, claims the right to take the operating expenses for the entire well against his share of the income with the result he is likely to have hardly any taxes to pay while he is acquiring a full interest in the oil well.

At the same time, B is paying little or no tax in the case of the oil well, C, who is receiving the production payment is receiving cost depletion on this payment. Thus, he is amortizing his entire cost over the period he receives his payments.

The C who has the mortgage on the apartment house fares no better than his counterpart with the production payment despite the special advantages of the B with the oil well. The C with the mortgage can spread his cost over the period of the mortgage but, presumably, any excess he receives is interest income and therefore ordinary income.

The crucial difference between the A-B-C transaction in oil and the mortgage for the apartment, therefore, lies in the treatment of B and the fact that in the A-B-C transaction B can amortize C's capital interest out of tax-free dollars rather than the "after-tax dollars" he must use in the apartment case.

port noted that a retained production payment is the same thing as a "loan secured by a mortgage on property and the 'borrower' [Carr Staley, Inc.] not personally, liable for the loan." *See* footnote 5, *supra*. Under previous law, the tax consequences of a retained production payment transaction are strikingly different from that accorded an ordinary sale of property with a purchase money mortgage to secure the unpaid balance of the purchase price. Where a retained production payment is utilized, the assignee-Mortgagor is permitted, to exclude from his income that amount necessary to "pay out" the retained production payment. Thus, the assignee is granted in effect the right to acquire a valuable capital asset by using "before-tax" dollars in payment for the asset. In contrast, assume that Guinn had sold taxpayer an apartment building. Conforming the facts established here to our hypothetical, Carr Staley would pay Guinn $2,000 as a down payment with Guinn taking a $5,000 purchase money mortgage on the apartment building without any personal liability on Carr Staley's part in case of a default. In this similar economic exchange, Carr Staley would receive the income produced by the apartment building, take authorized deductions, pay taxes on the income received (the rentals from the individual apartment units), and use the "after-tax" dollars to retire the outstanding purchase money mortgage. These two similar economic en-

---

In recent years, the use of mineral production payments has increased substantially. In 1965, reported carved-out production payment transactions totaled $214 million. One year later, this amount had more than doubled to a figure of $540 million. This represented a revenue loss to the Federal Government of $70 million. The reported amount of so-called A-B-C transactions in 1966 totaled $1.85 billion. Moreover, the use of the A-B-C transaction has spread to industries where it previously was not used. For example, the use of production payments was almost unknown in the coal industry several years ago. However, within recent years, coal properties have been sold, subject to retained production payments of approximately $800 million.

The committee agrees with the House that there is no reason why a person, who, in effect, is the borrower in a production payment transaction should be allowed to pay off the loan with tax-free dollars while a borrower of funds in any other industry must satisfy the loan out of taxed dollars. In addition, the committee agrees with the House that Congress did not intend to permit the avoidance of the limitation on depletion deductions and the mismatching of income and expenses which creates artificial tax losses by the use of production payments. Moreover, there is a substantial revenue loss which results from the use of production payments. It is estimated that the combined revenue loss from A-B-C transactions and carved-out production payments is between $200 and $350 million annually. An accel-eration of the revenue loss can be expected unless corrective action is taken.

*Explanation of provision.*—For the above reasons, both versions of the bill, in general, provide that production payment transactions are to be treated as loan transactions; that is, a loan by the owner of the production payment to the owner of the the mineral property. This is the same treatment as provided under present law whenever the payout of a production payment, in the case of a carve out, is in any manner guaranteed by the person who created it, or, in the case of an A-B-C transaction, is guaranteed by B, the purchaser of the working interest.

\* \* \* \* \*

In the case of retained production payments (that is, the sale of mineral property subject to a production payment), the bill provides that the production payment is to be treated as a purchase money mortgage loan (rather than as an economic interest in the mineral property). Accordingly, the income derived from the property which is used to satisfy the payment would be taxable to the owner of the mineral property, subject, of course, to the allowance for depletion. In addition, the production costs attributable to producing the minerals used to satisfy the production payment would be deductible by the owner of the working interest in the year incurred. Thus, the owner of the working interest would be placed in essentially the same position as persons in other industries who purchase business assets subject to a mortgage.

See Senate Report No. 91–552, 91st Cong., pp. 182–187 (1969) U.S.Code Cong. & Admin.News, pp. 2215–2219.

deavors were previously accorded completely divergent—and as Congress concluded unwarranted—tax treatment.

Furthermore, the Senate Report observed the great loss of revenue to the treasury which had resulted from these favored mineral transactions. Continued differentiation between the retained production payment on the one hand and the normal mortgage situation on the other would result in the perennial loss of millions of dollars in revenue. Accordingly, Congress acted to eliminate what it considered the unjustness which was the inevitable consequence of the disparate treatment accorded these economically similar transactions. The legislative history emphasizes the fact that taxpayers involved in substantially similar business transactions are accorded very different treatment. In one case (mineral transaction) the purchaser pays for an asset with tax free dollars; whereas, another taxpayer (purchase money mortgage transaction) pays for an asset with tax paid dollars.[6]

This the taxpayer contends Congress may not do without violating the fifth amendment. In support of its argument of the constitutional infirmity of Section 636(b), taxpayer relies principally on Hoeper v. Tax Commission of Wisconsin, 284 U.S. 206, 52 S.Ct. 120, 76 L.Ed. 248 (1931); Heiner v. Donnan, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932), and Schlesinger v. Wisconsin, 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 (1926). In each of these cases, the Supreme Court struck down tax provisions which it concluded were arbitrary and capricious and thus violative of fundamental due process.

In Hoeper v. Tax Commission of Wisconsin, *supra,* the Court held that a Wisconsin statute which taxed the combined total incomes of a wife and husband to the husband alone was a violation of the due process and equal protection clauses of the fourteenth amendment. The state's family unit taxation was found impermissible because a wife's separate property and income were hers alone in Wisconsin. The Court stated:

"We have no doubt that, because of the fundamental conceptions which underlie our system, any attempt by a state to measure the tax on one person's property or income by reference to the property or income of another is contrary to due process of law as guaranteed by the Fourteenth Amendment. That which is not in fact the taxpayer's income cannot be made such by calling it income." 284 U.S. at 215.

Taxation of the husband for the wife's income was found unacceptable because it was inconsistent with the property rights which had been granted the wife in Wisconsin. The Court rejected the proposition that the tax statute was an attempt by the Wisconsin legislature to redefine the property rights of the husband and the wife since that body had left unchanged the previous individual property rights vested in the wife. Therefore, the Court did not answer the question whether the state could have taxed the husband for the wife's income where the wife's income was attributa-

---

6. The district court found as a conclusion of law the following:

"3. In the enactment of Section 636(b) of the Internal Revenue Code of 1954, Congress sought to do away with the preferential tax treatment given taxpayers in the oil and gas industry through the use of 'production payments.' By eliminating the special status granted to production payments by the Supreme Court in Thomas v. Perkins, 301 U.S. 655 [57 S.Ct. 911, 81 L.Ed. 1324] (1937), Congress intended to place taxpayers in the oil and gas industry on the same basis as all other taxpayers, i. e., paying off what are essentially loans with 'after-tax dollars,' rather than with tax-free dollars as had been the case prior to August 7, 1969. The effect of Section 636(b) of the Code was to legislatively overrule the Supreme Court's decision in Thomas v. Perkins, *supra,* and extend the rationale of that Court's opinion in Anderson v. Helvering, 310 U.S. 404 [60 S.Ct. 952, 84 L.Ed. 1277] (1940), to all production payments."

ble to the husband under applicable property law.

Schlesinger v. Wisconsin, and Heiner v. Donnan, hold that it is arbitrary and capricious for a state or the federal legislature to create an irrebutable presumption that a transfer made within a certain period of time before the donor's death is a gift in contemplation of death. In both cases, the Wisconsin legislature in *Schlesinger* and Congress in *Heiner*, had created irrebutable presumptions that transfers made within six years and two years respectively of the donor's death were made in contemplation of death. Under both statutory schemes, the estate was not permitted to show that a transfer had been motivated by other than the donor's ensuing death.

In *Heiner*, the Court noted that the estate tax statute was enacted to levy duties on transfers which occur because of the death of the donor. Estate taxes are imposed to tax one's right to leave property to his beneficiaries *at death*. In contrast, a donor may wish to bestow property on another by an *inter vivos* conveyance without any consideration that his death may be impending. "The 'generating source' of such a gift is to be found in the facts of life and not in the circumstance of death." *Heiner, supra*, 285 U.S. at 322. Assuming that life motives have impelled the donor to initiate the transfer involved, then the fact that death subsequently occurs does not affect the character of the gift as originally made. A life motivated *inter vivos* gift once made is complete and "death does not result in a shifting, or in the completion of a shifting, to the donee of any economic benefit of property, which is the subject of a death tax . . . ." *Heiner, supra*, 285 U.S. at 323. The essential purpose of a death transfer tax was thus given decisive and controlling weight in resolving the statutory presumption attached to certain life transfers.

The Court concluded that Congress may enact appropriate legislation to prevent the evasion of death taxes by donors who attempt to transfer their prop-

erty in contemplation of death. Where gifts are made as a result of the donor's desire to avoid estate taxes and death thereafter ensues, Congress may tax such transfers. Any rule which seeks to tax life transfers must be phrased in language which will permit an appropriate representative of the transferor's estate to demonstrate that the donor was motivated *in fact* by circumstances other than his subsequent death. Therefore, the legislative schemes in *Heiner* and *Schlesinger* were condemned because two classes of gifts had resulted from the tax provisions with the tax consequences of each class depending on the fortuitous and conclusive factor that death occurred within a certain period of time. Such a classification was found to be arbitrary since a logical basis for the distinction was lacking. Where the statutory presumption was determined to be applicable, the donee was forced to pay the tax even though he had previously been the beneficiary of a completed *inter vivos* gift. Moreover, as the Court stated, the motivation to make a gift varies with the individual circumstances of the donor and the donee. Congress had attempted to remove any chance for the estate to establish the actual facts surrounding the gift and thus the estate was denied a fair opportunity of a hearing on the contested issue of fact.

 Although the logic evidenced in the cases discussed above is unassailable and enduring, we think the present statutory provision does not fall within any of the proscriptions delineated in those opinions. Where a taxpayer attacks a tax statute on the grounds that it contravenes the fifth amendment, the thrust and focus of his attack must be specific. The underlying and crucial question to be answered must be whether there is *a reasonable basis in fact* for the legislative scheme or classification drawn into focus. The parameters of a court's review is limited. We should not second-guess the legislature where there is factual support for the distinctions it has drawn. Judicial intervention should be limited to those situations where the

legislative classification under review is so arbitrary and capricious as to amount to a denial of fundamental due process. The Supreme Court set the tone for a reviewing court when a taxing scheme is challenged by enunciating the following principle:

" . . . [T]he due process clause of the 5th Amendment . . . is not a limitation upon the taxing power conferred upon Congress by the Constitution . . . [except] . . . in a case where although there was a seeming exercise of the taxing power, the act complained of was so arbitrary as to constrain to the conclusion that it was not the exertion of taxation but a confiscation of property; that is, a taking of the same in violation of the 5th Amendment, or, what is equivalent thereto, was so wanting in basis for classification as to produce such a gross and patent inequality as to inevitably lead to the same conclusion." Brushaber v. Union Pacific R.R., 240 U.S. 1, 24–25, 36 S.Ct. 236, 244, 60 L.Ed. 493 (1915).

Viewing the case, in this light, we think that the enactment under review accords reasonable treatment to taxpayers in similar economic situations.

■■■ The Congress by enactment of Section 636(b) has equated a retained production payment with a purchase money mortgage on property. This equation requires that taxpayers be treated identically because the economic reality of both undertakings is substantially similar. The legislative history plainly and unequivocally supports the Congressional classification as a reasonable one. It is well established that while state law determines the legal interests a taxpayer has in property, federal law will determine how those legal interests are to be taxed by the United States, Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932).

Taxpayer has failed to demonstrate to us how this transaction is substantially or significantly different from a purchase money mortgage given to secure the unpaid balance of the purchase price of property even though personal liability for the debt is waived by the mortgagee. Taxpayer is permitted to gain a valuable capital asset by using the property to produce income to retire the production payment, retained by Guinn, the assignor of the working interest. This is the same splitting of interests that occurs when one purchases an apartment building and rents the building to pay off the outstanding mortgage retained by the seller to secure the payment of the balance due on the transaction.

■■■ Legal title to the property concerned is not the decisive factor in determining whether the government may tax the income accruing to that property. Anderson v. Helvering, *supra*. Taxation should be based on the economic realities of the particular commercial transaction involved. By piercing the veil created by the "magic words" which were used in the instant transaction between Guinn and the taxpayer, Congress has accorded taxpayer the same treatment meted out to others similarly situated. We think the Congressional enactment here involved is consistent with the observation made by the Supreme Court when it said:

"Refinements of title are without controlling force when a statute, unmistakable in meaning, is assailed by a taxpayer as overpassing the bounds of reason, an exercise by the lawmakers of arbitrary power. In such circumstances the question is no longer whether the concept of ownership reflected in the statute is to be squared with the concept embodied, more or less vaguely, in common-law traditions. The question is whether it is one that an enlightened legislator might act upon without affront to justice. Even administrative convenience, the practical necessities of an efficient system of taxation, will have heed and recognition within reasonable limits. Liability does not have to rest upon the enjoyment by the taxpayer of all the privileges and benefits enjoyed by the most favored own-

er at a given time or place. Government in casting about for proper subjects of taxation is not confined by the traditional classification of interest or estates. It may tax, not only ownership, but any right or privilege that is a constituent of ownership. Liability may rest upon the enjoyment by the taxpayer of privileges and benefits so substantial and important as to make it reasonable and just to deal with him as if he were the owner, and to tax him on that basis." Burnet v. Wells, 289 U.S. 670, 678, 53 S.Ct. 761, 764, 77 L.Ed. 1439 (1932). (Citations omitted).

Thus we cannot conclude that the classification here attacked is so lacking in reason as to be arbitrary or capricious. The legislative scheme under review is a reasonable measure by Congress to remove the unequal and unjust treatment of taxpayers which occurs merely from the form of the transaction employed.

Accordingly, Section 636(b) is constitutional at least as applied to the transactions revealed by the record in this case. The judgment of the district court is affirmed.