Thomas R. PLEDGER and Phyllis R. Pledger, Petitioners-Appellants,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.

No. 79–3279.

United States Court of Appeals, Fifth Circuit.
Unit B

April 2, 1981.

Rehearing and Rehearing En Banc Denied April 29, 1981.

Robert O. Rogers, David S. Meisel, Palm Beach, Fla., for petitioners-appellants.

M. Carr Ferguson, Asst. Atty. Gen., Tax Div., Gilbert E. Andrews, Act. Chief, Appellate Section, Gary R. Allen, Atty., Donald B. Susswein, Atty., U. S. Dept. of Justice, Washington, D. C., N. Jerold Cohen, Chief Counsel, Internal Rev. Service, Washington, D. C., for respondent-appellee.

Before MORGAN, FAY and FRANK M. JOHNSON, Jr., Circuit Judges.

**LEWIS R. MORGAN, Circuit Judge.**

In this appeal from the Tax Court decision, 71 T.C. 618, sustaining the Commissioner's finding of deficiency, petitioner-appellant Pledger questions whether the full value of corporate stock purchased pursuant to an employee stock option and subject to certain securities restrictions can constitutionally be taxed as income under Section 83(a) of the Internal Revenue Code. The taxpayer also challenges the decision of the Tax Court that the term "any restriction" in section 83(a) includes the restrictions of an investment letter. Responding to these challenges, we affirm the decision of the Tax Court below.

The stipulated facts in this dispute reveal that Thomas R. Pledger[1] (Appellant) purchased 30,000 shares of common stock of Burnup & Sims, Inc. pursuant to an option given to him in the previous year by Mr. Riley V. Sims, the president of the company, as compensation for services. Appellant purchased 6,000 shares in October of 1971 and purchased the remaining 24,000 shares in November. Upon acquiring the stock appellant executed and delivered to Mr. Sims an investment letter indicating that the stock was acquired for investment and not for sale.[2] The letter also stated that the stock certificates were to be stamped with a legend indicating that the shares were not registered under the Securities Act of 1933 and could not be sold absent an effective registration or a "no action" letter from the SEC.

Because of the restrictions imposed by the investment letter, the shares of stock were worth as stipulated only 65 percent of their fair market value if sold pursuant to

---

1. This case is brought in the name of the appellant and his wife, Phyllis R. Pledger, because they filed jointly with the Internal Revenue Service in the tax years in question. Because Thomas R. Pledger is the primary party in this case, this opinion will hereinafter refer to him as the taxpayer.

2. This action was taken in order for the transaction to qualify as a private offering, exempted from registration requirements under the

Securities Act of 1933 by § 4(2) of that act. 15 U.S.C. § 77d(2). Stock issued in these private offerings is commonly referred to as "lettered" stock, and is subject to certain restrictions regarding sale under the rules and regulations of the securities laws. This stock may be sold after a two year holding period without regard to restrictions if other conditions are met. Rule 144(d)(1), 17 C.F.R. § 203.144 (1980).

another private placement during a two-year period after purchase. The taxpayer for the taxable year 1971 calculated the excess of the discounted value of the stock over the amount paid for the stock and reported as income $195,363.[3] The Commissioner on audit increased the amount of compensation by $239,137 based on the difference between the amount the full fair market value exceeded the taxpayer's cost and the amount of taxes the taxpayer had paid.[4] From this the Commissioner determined a deficiency in the amount of $155,416 and accordingly adjusted the taxpayer's basis in the stock.

Appellant filed a petition for a redetermination of deficiency in the United States Tax Court. The Tax Court upheld the deficiency and the taxpayer appealed to this court.

### I.

█ The first issue raised by the appellant presents the recurring question of what is income. All parties agree that the option to purchase stock was compensation for services and that the purchase of the stock was a taxable event. Taxpayer asserts, however, that the government is utilizing Section 83(a) of the Internal Revenue Code[5] to tax a nonexisting value, i. e., the excess of the fair market value of the stock over the discounted value. Section 83(a) provides that the value of compensation in the form of stock or other property for purposes of income taxation is to be determined by reference to the fair market value of the property "without regard to any restriction other than a restriction which by its terms will never lapse." 26 U.S.C. § 83(a). To the degree this statute allows taxation of an amount in excess of the value for which taxpayer could sell the stock during the time of restriction, taxpayer argues that the statute exceeds the powers of Congress to tax under the Sixteenth Amendment and Article 1, Section 8 of the Constitution.[6] Relying on the classic defini-

---

3. Appellant calculated the amount of compensation as follows:

| | |
|---|---|
| Value of Stock on Dates of Exercise (per appraisals) | $395,363 |
| Amount Paid for Stock on Dates of Exercise | 200,000 |
| Amount Determined to be Compensation (excess of value over amount paid) | $195,363 |

4. The Commissioner calculated the amount of compensation as follows:

| | |
|---|---|
| Value of Stock on Dates of Exercise (per market value) | $634,500 |
| Amount Paid for Stock on Dates of Exercise | 200,000 |
| Amount Determined to be Compensation | $434,500 |
| Amount Reported on 1970 Form 1040 | $195,363 |
| Deficiency | $239,137 |

5. 26 U.S.C. § 83(a) (as added by § 321(a) of the Tax Reform Act of 1969, P.L. 91–172, 83 Stat. 487). The statute provides in pertinent part as follows:

Property transferred in connection with performance of services.

(a) *General Rule.*—If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

(2) the amount (if any) paid for such property, shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable. The preceding sentence shall not apply if such person sells or otherwise disposes of such property in an arm's length transaction before his rights in such property become transferable or not subject to a substantial risk of forfeiture.

6. The government argues that the taxpayer concedes that even if the tax is not appropriate under the Sixteenth Amendment, the tax could be upheld under the general taxing provisions of Article 1, Section 8 if the tax is uniform. The government is correct in arguing that the progressive taxation scheme of the income tax does not affect the finding that the tax imposed in this case is uniform. *See Knowlton v. Moore,* 178 U.S. 41, 20 S.Ct. 747, 44 L.Ed. 969

tion of income as presented in *Eisner v. Macomber*,[7] 252 U.S. 189, 207, 40 S.Ct. 189, 193, 64 L.Ed. 521 (1920), taxpayer argues that the excess value is not realized gain or "something of exchangeable value . . . derived from property." *Id.* With these contentions, we disagree.

■ First, we note that the Sixteenth Amendment did not limit or expand the power of Congress to tax under Article 1, Section 8 of the Constitution. *See Brushaber v. Union Pac. R. R.*, 240 U.S. 1, 36 S.Ct. 236, 60 L.Ed. 493 (1916). The Sixteenth Amendment simply provided for taxation of income without apportionment. In *Eisner v. Macomber, supra*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521, the Court attempted to define the term "income" used, but left undefined, in the Sixteenth Amendment. In that case, the court struck down a taxing statute on the ground that it attempted to tax stock dividends which were not income within the meaning of the Sixteenth Amendment. The case distinguished between income and capital without focusing particularly on the issue of compensation presented in this case. In defining income as "something of exchangeable value," the Court was stating what was income, not defining the amount of income received. Later developments in the tax law reveal that the definition was not intended as an all-encompassing implication of income. *See Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431, 75 S.Ct. 473, 476, 99 L.Ed. 483 (1955). *See generally* Note, "Apparent Abandonment of a Definitive Concept of Income," 45 *Harv.L.Rev.* 1072 (1923). The parties in this case agree that income was received; the only question is whether 65 percent of the fair market value or the full fair market value was received for purposes of taxation. The language of *Eisner* does not control this case. The taxing scheme does not contravene the language of *Eisner* defining income under the Sixteenth Amendment, and even if it did, the language of *Eisner* is not controlling where a different issue of income is presented.

In a challenge similar to the one in this case the Second Circuit held in *Sakol v. Commissioner*, 574 F.2d 694 (2d Cir.), *cert. denied* 439 U.S. 859, 99 S.Ct. 177, 58 L.Ed.2d 168 (1978), that Section 83(a) did not violate the Sixteenth Amendment. In that case the taxpayer received as compensation what she claimed to be a lesser value than the fair market value of stock purchased pursuant to a stock option plan and subject to contractually imposed restrictions on the sale. *The court considered that the language of Eisner requiring "gain" to be realized for "income" to exist had been modified by subsequent decisions upholding the accrual method of accounting, Burnet v. Sanford & Brooks Co., 282 U.S. 359, 51 S.Ct. 150, 75 L.Ed. 383 (1931), the doctrine of constructive receipt, Corliss v. Bowers, 281 U.S. 376, 50 S.Ct. 336, 74 L.Ed. 916 (1930), and the tax rules prohibiting assignment of income, Helvering v. Horst, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75 (1940). Id.* at 700. The court concluded that the power of Congress to create a realistic and workable tax scheme to prevent tax avoidance was sufficiently broad to permit the taxation scheme of Section 83(a).[8]

■ In this case when the taxpayer obtained the stock option, he received some-

---

(1900); *Penn Mutual Indem. Co. v. Commissioner*, 32 T.C. 653 (1959), *aff'd* 277 F.2d 16 (3d Cir. 1960). However, because the real arguments in this case center on the issue of income, we base our decision on an analysis under the Sixteenth Amendment.

7. Relying on two earlier cases the Court in *Eisner* stated:

Income may be defined as the gain derived from capital, from labor, or from both combined. . . . [It is] a gain, a profit, something of exchangeable value *proceeding from* the property, *severed from* the capital, however

invested or employed, and *coming in*, being "*derived*" that is, *received* or *drawn by* the recipient (the taxpayer *for his separate* use, benefit and disposal; *that* is income derived from property. (Emphasis in original).

8. The dissent stresses that our reliance on *Sakol* is misplaced because of the distinction between governmentally imposed restrictions and contractually imposed restrictions. Although we do not solely rely on the rationale of that case, the distinction between the two cases is insufficient to require a different result. *See* note 14 and accompanying text *infra*.

thing of value. When he purchased the stock, the value of his compensation for purposes of taxation could be determined by reference to the fair market value of the stock on the day of purchase. Although taxpayer argues that the stock subject to the securities restrictions was worth only 65 percent of its fair market value, taxpayer ignores the fact that the stipulation regarding the 65 percent value pertained only to the discounted value if the stock were sold in another private placement sale.[9] A stipulation as to the value of property if sold under certain circumstances does not necessarily reflect the value of the property in the hands of the current owner.[10] Although the taxpayer could receive only 65 percent of the fair market value of the stock if sold during the period of the restriction, it does not necessarily follow that the only value the taxpayer received as compensation was 65 percent of the stock's fair market value. The full value of the stock existed from the moment of purchase; it was only temporarily subject to a diminution in value if exchanged because of the securities restrictions. Despite taxpayer's claim to the contrary, there was no non-existent value upon which he was taxed.

The problem in this case is primarily one of timing rather than value of what was received. If taxpayer were taxed on only 65 percent of the fair market value at the time of purchase, but held the stock until the restrictions lapsed, the remaining 35 percent of the fair market value which was also compensation to the taxpayer would be taxed upon sale at the more favorable capital gains rate. This 35 percent value is not an investment increase that the capital gains tax was designed to benefit. Assuming that the stock maintained its value, the 35 percent value was certain to accrue when the restriction lapsed. Appellant, however, argues that if the stock decreased in value, the taxpayer would initially be taxed at ordinary income rates for the full value but would only be allowed to deduct any decrease in value as a capital loss. This fact is arguably true[11] but is part of the risk any stockholder encounters when he purchases stock. A corporate employee purchasing stock pursuant to a stock option is not entitled to receive special tax benefits that a general purchaser of stock cannot receive, and indeed the corporate employee should not be heard to complain that he is unfairly taxed on the full fair market value of his compensation when the stock, with his knowledge and implicit consent, is subject to temporary restrictions. In order to achieve a workable and practical solution for taxation, Congress may constitutionally tax the full fair market value at the time of purchase without regard to the temporary restriction. *Sakol v. Commissioner, supra,* 574 F.2d at 700. Although this value is not the value taxpayer can receive upon immediate sale, Congress may establish this value as the taxable value without contravening the Sixteenth Amendment.

## II.

█ In addition to his argument based on the Sixteenth Amendment, appellant chal-

9. The stipulation stated as follows:

> 11. On the respective dates that petitioner acquired the shares of Burnup & Sims, Inc. under the option, if he had offered said shares for sale in another private placement, such shares would have been subject to a discount of 35 percent from the fair market value of Burnup & Sims, Inc. stock traded over the counter because of the restrictions imposed by the petitioner's investment letter representations. Rec. at 71.

10. At first glance the phrase "something of exchangeable value" in the definition of income under *Eisner* may seem to imply that the exchangeable value is the value of the property. Although this may be the standard measure for value of income, it does not apply in a case such as this where the property given as compensation is subject to temporary diminutions in value. As noted previously, the definition in *Eisner* did not establish how much income was received, but only whether income was received. In this case, although something of exchangeable value was received, the value of the income for purposes of taxation could not be determined by its immediate exchangeable value.

11. The Second Circuit in *Sakol* noted that a taxpayer in such a situation would be entitled at least to a capital loss. The Internal Revenue Service has not yet published its position as to whether ordinary treatment or capital treatment would be afforded.

lenges the application of Section 83(a) under the due process clause of the Fifth Amendment. Relying primarily on *Heiner v. Donnan*, 285 U.S. 312, 52 S.Ct. 358, 76 L.Ed. 772 (1932), and *Schlesinger v. Wisconsin*, 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557 (1926), two cases which struck down statutes conclusively presuming certain gifts were made in contemplation of death, taxpayer argues that Section 83(a) operates as a conclusive presumption that "lettered" stock received as compensation has the same value as its registered counterpart. Because this value is a fiction, taxpayer argues, the statute deprives the taxpayer of property without due process of law.

The standard of review in the Fifth Circuit governing a due process challenge to a taxing statute is, as taxpayer concedes, whether the taxing statute is so arbitrary and capricious as to amount to a denial of due process. *Carr Staley, Inc. v. United States*, 496 F.2d 1366, 1375 (5th Cir.), *cert. denied*, 420 U.S. 963, 95 S.Ct. 1355, 43 L.Ed.2d 441 (1975). *See also Brushaber v. Union Pac. R. R., supra*, 240 U.S. at 24–25, 36 S.Ct. at 244. The cases upon which taxpayer primarily relies, *Heiner v. Donnan, supra*, 285 F.2d 312, and *Schlesinger v. Wisconsin, supra*, 270 U.S. 230, 46 S.Ct. 260, 70 L.Ed. 557, applied this standard, holding that the creation of an irrebuttable presumption in the legislation in question was arbitrary and capricious. The court in *Carr Staley, Inc. v. United States, supra*, 496 F.2d at 1374, considered these cases but held in that case that the earlier cases were not controlling and that a "reasonable basis in fact" would justify the statutory scheme. Thus, the irrebuttable presumption doctrine, to the degree it exists in taxing cases, clearly does not require a holding that any irrebuttable presumption is per se unconstitutional as an arbitrary and capricious statutory scheme. This view received further support from the Supreme Court's subsequent pronouncements concerning the irrebuttable presumption doctrine in *Weinber-*

*ger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975), and *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), indicating that in "purely economic matters" the rational relationship test shall apply as the standard of review. At least one commentator [12] and one court [13] have recognized that these recent irrebuttable presumption cases have probably eroded the validity of *Heiner* and *Schlesinger*. Nevertheless, under either the Fifth Circuit or the Supreme Court standard, it is clear that the statutory scheme established by Congress for taxation is entitled to great deference by the courts and shall not be disturbed unless arbitrary and capricious and without a reasonable basis in fact. *See Sakol v. Commissioner, supra*, 574 F.2d at 698.

In applying the applicable standard to the facts of the case before the Court, we first note that the statutory scheme in question does not necessarily fall within the parameters of the irrebuttable presumption doctrine. The statute does not establish an irrebuttable presumption on its face, and arguably does not establish an irrebuttable presumption at all. The statute does not dictate the actual value of the property held by the taxpayer, but simply provides as a matter of substantive law the manner in which it shall be taxed. Taxation of income is an area in which Congress is allowed great flexibility in order to eliminate tax avoidance. Nevertheless, assuming that the statute does establish an irrebuttable presumption, we hold that the statutory scheme is not arbitrary and capricious and is supported by a reasonable basis in fact.

As the Second Circuit noted in *Sakol v. Commissioner, supra*, 574 F.2d at 698, applying the rational relationship test of *Usery v. Turner Elkhorn Mining Co., supra*, 428 U.S. 1, Congress could legitimately have enacted Section 83(a) to eliminate income tax avoidance through the use of restricted stock options. Although in a case such as the present one the sole motive for utilizing

---

12. *See* L. Tribe, *American Constitutional Law* § 16–32, 1095 n. 25 (1978) (the early tax cases are "plainly not good law today.)

13. *Sakol v. Commissioner, supra*, 574 F.2d at 698 n. 10.

a stock option plan may not be tax avoidance, the issuance of "lettered" stock allows a corporation to compensate an employee with tax-favored income, except for Section 83(a). The corporation's choice of the use of a "lettered" stock plan may include both the motive of avoiding securities registration and the motive of providing tax-favored compensation. Thus, the rationale in *Sakol* regarding the purpose of Section 83(a) applies in this case as well. Congress may legitimately attempt to eliminate tax avoidance by taxing the full fair market value of stock purchased pursuant to the stock option plan without regard to any restrictions, whether contractually imposed or imposed under securities regulations.[14] Taxpayers in both situations choose to participate in the stock option plan presumably with full awareness of the tax consequences under Section 83(a). *See Sakol v. Commissioner, supra,* 574 F.2d at 699. No legitimate reason exists for making a sharp line distinction between the types of restrictions.

The tax scheme imposed under Section 83(a) has a reasonable basis in fact in that the full value of the property purchased or given as compensation is indeed income subject only to temporary restrictions and diminution in value. As we explained in Section I of this opinion, the 65 percent stipulated value was only the monetary amount that taxpayer could receive if the property was immediately sold. The taxpayer, however, received more than the 65 percent stipulated value. The taxing scheme imposed by Congress more accurately reflects what taxpayer received as compensation than a scheme that taxes the taxpayer on merely a portion of the compensation. Thus the taxing scheme has a reasonable basis in fact. As the Second Circuit stated in *Sakol v. Commissioner, supra,* 574 F.2d at 701, "Congress may clothe the tax incidental to [nonqualified stock plans] with a ready-made, rather than custom-tailored, suit."

### III.

In addition to his constitutional claims, taxpayer makes the final argument that the statutory term "any restriction" does not include restrictions on "lettered" stock imposed under the federal securities laws. Taxpayer argues that the statute applies only to contractually imposed restrictions such as those under consideration in *Sakol v. Commissioner, supra,* 574 F.2d 694.

First, the plain language of the statute seems to apply to security restrictions as well as contractually imposed restrictions. Secondly, we note that the Treasury Regulations specifically include restrictions under federal and state securities laws as restrictions to be disregarded under Section 83(a). Treas.Reg. § 1.83(h), § 1.83–5(c), Example (3). These regulations must be sustained unless plainly unreasonable or inconsistent with the language of the statute. *Fulman v. United States,* 434 U.S. 528, 533, 98 S.Ct. 841, 845, 55 L.Ed.2d 1 (1978). These regulations are both reasonable and comport with the language of the statute referring to "any restriction."

Finally, the legislative history makes no distinction between contractually imposed and legally imposed restrictions. *See* H.R.Rep.No. 91–413, 91st Cong., 1st Session, *reprinted in* [1969] U.S.Code Cong. & Ad. News 1645; S.Rep.No. 91–552, 91st Cong., 1st Session, *reprinted in* [1969] U.S.Code Cong. & Ad. News 2027; Cong.Rep.No. 91–782, 91st Cong., 1st Session, *reprinted in* [1969] U.S.Code Cong. & Ad. News 2392. Although the committee reports refer primarily to contractually imposed restrictions, the statute was enacted to prevent tax avoidance. Whether this occurs through the use of contractually imposed restrictions or through utilization of securities restrictions in issuing "lettered" stock, the intent of Congress was to prohibit tax abuses. The language of Section 83(a) concerning "any restriction," therefore, includes restrictions imposed by the federal and state securities laws, such as the restrictions im-

14. *See* note 8 *supra.*

posed in this case. The decision of the Tax Court is

AFFIRMED.

FAY, Circuit Judge, dissenting:

This Court today holds that a tax may be levied on purported gain from the exercise of certain stock options even though the Internal Revenue Service (Service) has stipulated that the actual value of those options at the time of the taxable event would not give rise to the realization of income asserted by the Service were the gain to be measured by the difference between the actual value and the cost of the options to petitioner-taxpayer. I respectfully dissent.

The facts of this case are very straight forward. In 1970, petitioner received, as compensation for employment, the option to purchase 30,000 shares of stock of his employer company. In 1971, petitioner exercised his options and purchased the shares, paying the agreed on option price of $200,-000. The stock received by petitioner was "lettered." This was solely the result of the requirements of section 4(2) of the Securities Act of 1933, relating to the disposition of stock distributed in a "private placement." That section makes it unlawful to publicly trade stock issued in a private placement for a period of at least two years from the date of issuance.[1] Both parties agree that the exercise of the options was the taxable event giving rise to the realization of compensation income by petitioner. Most significantly, both parties agree that, at the time of the taxable event, the restrictions placed on the stock received by petitioner resulted in its actual value[2] being 35% less than the value of the same number of such shares that were not subject to the restrictions imposed by section 4(2) of the Securities Act. The Service nonetheless contends that, pursuant to section 83 of the Internal Revenue Code of 1954 (Code), petitioner may be taxed as though the value of the stock were what it would be were the legal restrictions not placed on it. Petitioner responds that the Service's position is premised on a wholly erroneous interpretation of Code § 83 and that to tax such admittedly non-existent gain is unconstitutional.

Before considering the specific statute in question, a review of certain fundamental truisms of tax law might be helpful in properly focusing the issues. To begin with it is accepted that the power of Congress to levy taxes is not without limit. Prior to the adoption of the Sixteenth Amendment, a time which though so close is so very far away, the imposition of an income tax was unconstitutional. Subsequent to its adoption, Congress was authorized to institute a progressive tax, but only to the extent that the tax applied to income. Income is, as it was classically defined in *Eisner v. Macomber*, 252 U.S. 189, 40 S.Ct. 189, 64 L.Ed. 521 (1920), the "gain derived from capital, from labor, or from both combined..." 252 U.S. at 207, 40 S.Ct. at 193. It is "something of exchangeable value *proceeding from*, the property ... and *coming in*, being '*derived*' that is, *received* or *drawn* by the recipient (the taxpayer) *for his separate* use, benefit, and disposal—*that* is income derived from property. Nothing else answers the descriptions." 252 U.S. at 207, 40 S.Ct. at 103. I think it significant to remember that, although the definition of income has become more complex in response to the intricate tax laws and tax problems resulting therefrom, when the government seeks to tax something as income, it may do so only to the extent that "something of exchangeable value" was derived from labor or capital. By way of simple example, it is clear that if A, attorney, agrees to draft P, painter's, will in exchange for a painting worth $200, and at the end of the transaction P gives A a painting that would be worth $200 but for a

---

1. Stock subject to the restrictions of section 4(2) does not automatically become freely tradeable at the end of the two-year period. The Securities Act prescribes certain additional conditions that must be satisfied. Those conditions have no relevance to this appeal.

2. By actual value, I mean the amount which the parties stipulated as the fair market value of stocks so restricted.

hole in the canvas, that fact making it worth only $100, A may only be taxed to the extent of $100. A may only be taxed on the value of what he actually received, not on the value that the property would have had but for a condition affecting such value.

The general rule for the taxation of compensation income upon the receipt of property, rather than cash, is very simple. The taxpayer may be taxed on the fair market value of the property received less any amount which the taxpayer may have paid to receive the property. Taxable gain equals fair market value minus basis. Fair market value is that "price which would probably be agreed upon by a seller willing, but under no compulsion, to sell, and a buyer willing, but under no compulsion, to buy, where both have reasonable knowledge of the facts." [3]

The last and most indisputable truism is that people generally do not like to pay taxes. To that end, taxpayers have often gone to great lengths to devise schemes whereby they can avoid taxation on what properly should be taxable. Such schemes are known as "tax avoidance devices." Both Congress, by legislation, and the Service, by regulation, may recharacterize such schemes when their primary purpose is tax avoidance or deferral. Individual taxpayers are prevented thereby from agreeing to carry out transactions in a tax-free or tax-reducing form when the substance of the transaction should properly be structured as a fully taxable event.

Turning to the transaction in question, it appears without equivocation that, but for section 83 of the Code, the only gain on which petitioner would be taxable is the difference between the fair market value of the stock, as that value is decreased by the restrictions placed thereon, and the price paid for the stock.[4] The question then becomes whether section 83 was intended to affect the amount by which "lettered stock" would be taxed and, if so, whether that effect is constitutionally permissible. I resolve both of those issues in the negative.

Section 83 provides in pertinent part: If, in connection with the performance of services, property is transferred to any person other than the person for whom such services are performed, the excess of—

"(1) the fair market value of such property (determined without regard to any restriction other than a restriction which by its terms will never lapse) at the first time the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever occurs earlier, over

"(2) the amount (if any) paid for such property shall be included in the gross income of the person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable.

It surely must be clear that to the extent Code § 83 is applied to the present case in such a manner as to impose a tax on an amount greater than the difference between the stipulated value and the stipulated price of the stock, the statute is unconstitutional. The Service simply may not tax the excess of the value of unrestricted stock over the value of the restricted stock actually received. Whatever that excess is, it most certainly is not income. To say, as the Tax Court did in this case, that "[w]hile

---

3. Newberry, 39 BTA 1123 (1939).

4. This is the standard measure of recognizable gain. Prior to adoption of section 83, the amount actually taxed would have been less than this standard measure. This was the result of the operation of regulations adopted in 1959, 1.421–6(d)(2), Income Tax Regs., providing that the tax on bargain purchases of stock subject to restrictions having a significant effect on value would be imposed only when the restrictions lapsed or the property was sold in an arm's-length transaction. The measure of income as ordinary gain income at that point was the lesser of the fair market value of the stock at the time of its acquisition, determined without regard to any restrictions, or the fair market value at the time the restrictions lapsed, over the cost of the stock.

some unfairness and inequity may result from the operation of section 83, Congress could rationally have concluded that such a result was justified by the ease and certainty of the section's operation," is to absolve both Congress and the Service of their duty to impose taxes within the parameters established by the Constitution.

The majority opinion suggests that this case requires this Court to determine the value of appellants' stock. That is incorrect. The value was stipulated by the taxpayer and Service as 65 percent of the market value of an equal number of freely tradeable shares. The issue in this case should be whether the government can tax an amount greater than the undisputed value of the property received. Rather than confront that question, the majority says, "A stipulation as to the value of property if sold under certain circumstances does not necessarily reflect the value of the property in the hands of the current owner. (footnote omitted) Although the taxpayer could receive only 65 percent of the fair market value of the stock if sold during the period of the restriction, it does not necessarily follow that the only value the taxpayer received as compensation was 65 percent of the stock's fair market value." At 291. While those statements may be true in a case in which valuation is contested, I am at a loss to understand their relevance to this case, because the parties agree on the value of the property received. Moreover, if there is some value other than that stipulated to by the parties, the majority gives no hint as to what it may be. The majority opinion goes on to say, "The full value of the stock existed from the moment of purchase; it was only temporarily subject to a diminution in value if exchanged because of the securities restrictions." *Id.* Not only is that statement contrary to the parties' stipulation, it is logically unsupportable. In the first place, how can it be said that the full value existed at the time of purchase? It is undisputed that appellant could not have found anyone to give him that full value in exchange for the restricted shares. The logic of the majority opinion would lead to the conclusion, by way of simple example,

that the holder of a ten-year bond whose present value is $100 and whose value at maturity is $200 could be taxed at the greater value because its present lower value was a temporary condition. Secondly, the majority makes the totally unsupported assumption that the present diminution in value is a temporary condition. When the restrictions on the stock lapse, its value will be the then existent market value. That value may be more or less than, and is unlikely to be the same as, the present market value. It is conceivable that the stock had reached an all-time high at the time the parties agreed to its value. In that situation, it would be grossly unfair to say that the value of the stock was only temporarily diminished.

To the extent that this Court and the Tax Court relied on *Sakol v. Commissioner,* 574 F.2d 694 (2d Cir. 1978), aff'g 67 T.C. 986 (1977), *cert. denied,* 439 U.S. 859 (1978), to justify the results reached here, I conclude that their reliance is misplaced. Moreover, it demonstrates a fundamental misunderstanding of the reasons for the adoption of Code § 83. *Sakol involved a contractual agreement* between employer and employee that restricted the transferability of the stock purchased. *Sakol did not involve stock whose value was affected by legal restrictions imposed by the Securities Act. Sakol* said that section 83 could be constitutionally applied so as to value the stock at an amount equal to that which it would have had without the *contractually created restrictions.* The rational for that holding was simply that the statute could be constitutionally applied to privately created contractual restrictions because such agreements had been used historically as a tax avoidance or tax deferral device to disguise income where it actually existed. In its holding in *Sakol,* the Second Circuit Court of Appeals specifically justified the application of section 83 to *contractually created restrictions on stock saying,* "Because nonqualified plans have been the vehicles of tax avoidance Congress may clothe the tax incidental to them with a ready-made, rather than a custom-tailored, suit." 574 F.2d

at 701. The language of both courts' decisions makes it unequivocal, however, that the statute was only intended to apply to privately created contractual restrictions, not legally imposed restrictions. In framing the issue for the Second Circuit, Judge Oakes began the opinion by saying, "Is it constitutional . . . in taxing a corporate employee in connection with his purchase of his employer's stock, not to take into account any diminution in value of the stock that may be present by virtue of temporary *restrictions on transfer in the employer's underlying stock purchase plan?*" (emphasis added) 574 F.2d at 695. In discussing the manner in which Congress intended section 83 to operate, the Court went on to say,

> It requires a taxpayer to include in gross income the excess of the stock's fair market value over its cost, as soon as the taxpayer's interest is no longer subject to a substantial risk of forfeiture. The actual value of the stock arguably may be less than the value of stock readily transferable on the open market *because of restrictions imposed by the stock purchase plan.* Nevertheless, *these restrictions,* other than permanent, nonlapsing restrictions, *may not be considered in determining fair market value.*

(emphasis added) *Id.* at 695–96. In the opinion affirmed by the Second Circuit, the Tax Court said, "[t]he section [83] provides that property transferred in connection with the performance of services is to be included in the income of the transferee in an amount which exceeds the employees' cost by the fair market value of the property transferred, *without regard to any contractual restriction on its disposition. . . .*" (emphasis added) 67 T.C. at 989. The Tax

Court later said, ". . . to minimize the potential for continued tax avoidance and to further discourage the use of restricted stock purchase plans as a means of obtaining an equity interest in one's employer, Congress decided to measure the income derived from such arrangements *without regard to transitory restrictions imposed by the parties* on the shares purchased." (emphasis added) 67 T.C. at 99. It is clear, therefore, that *Sakol* allows the application of section 83 to privately created restrictions on stock transfer *only* because those restrictions may operate as tax avoidance schemes. The same cannot be said of *governmentally imposed restrictions* on stock transfer.

It seems to me there is a critical distinction between holding that section 83 may constitutionally be applied to *private agreements* that restrict the transfer of stock, because such agreements are often used to disguise the existence of income, and holding that section 83 may constitutionally be applied to *governmentally imposed restrictions* on the transfer of stock, when the effect is to tax income that *does not exist.*[5] Our government does not have the authority to tax that amount. In this case the Service has stipulated that such value does not exist. The government's position distills to *a combination of semantic gymnastics and bureaucratic convenience* neither of which could possibly justify our violating such a fundamental principle.[6] It is unfortunate that this Court chooses to give an unconstitutional interpretation to a statute whose purposes and proper interpretation are constitutional.

Accordingly, I respectfully dissent.

---

**5.** The majority dismisses the distinction I draw between the contractually created restrictions in *Sakol* and the governmentally imposed restrictions here as "insufficient to require a different result." I am at somewhat of a loss to understand how such a significant difference can be *disposed of with so little consideration.* See *Opinion* notes 8 and 14 and accompanying text.

**6.** The majority points out that, even with its ruling, all is not lost for the taxpayer. Should

the value of the stock at the time it becomes freely tradeable equal its present value of 65 percent of market value, the taxpayer may recoup the $239,137 deficiency he has paid, as a capital loss. What the majority fails to note is that, assuming the appellant can take the maximum annual capital loss of $3,000, as provided for in Code section 1211, the entire amount could be recouped in slightly under eighty years. I cannot imagine that this offers great solace to the taxpayer.